THE COASTWISE.

(District Court, D. Massachusetts. November 3, 1915.)

No. 1039.

1. TOWAGE ☞11(5)—STRANDING OF TOW—LIABILITY OF TUG—DEVIATION FROM PROPER COURSE.

A barge being towed up the New Jersey coast at night was stranded on Brigantine Shoal. There was a fresh easterly wind, but it was not foggy, and there were no unusual weather conditions. The proper course was outside the buoy marking the shoals, while the stranding was two or thre miles inside. Soundings taken before showed a depth of 10 fathoms

only, which is not considered safe in that locality with an east wind. *Held*, that the stranding was due to the negligence of the tug.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 17; Dec. Dig. ☞11(5).]

2. SHIPPING ☞136—LOSS OF CARGO OF TOW—HARTER ACT.

The owner of a barge let her by .charter to carry a cargo between two ports, and also provided a tug owned by him to tow her. Both barge and tug were seaworthy and· properly manned, equipped, and supplied. The barge and her cargo were totally lost by stranding through negligence in operating the tug. *Held*, that Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (Comp. St. 1913, § 8031), did not relieve the tug from liability for loss of the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ☞136.]

In Admiralty. Suit by Melville L. Cobb against the tugboat Coastwise. Decree for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

James J. Macklin, of New York City, for claimant.

MORTON, District Judge. The tow, consisting of the tug Coastwise and the barge Soule, rounded Northeast End Light and started up the New Jersey coast in a moderate northeasterly wind that was drawing farther to the east and freshening. A heavy underswell was running and some top sea. Going north from that point the proper course lies well outside the buoy off Brigantine Shoal. The officer on the tug intended to follow that course. The stranding occurred on Brigantine Shoal, two or three miles at least inside the buoy, and about four miles off the course. The first question is whether the accident was due to negligent navigation by the tug.

[1] The danger of being swept on this coast and on this very shoal in an easterly wind is well recognized. The United States Coast Pilot says:

"In strong easterly winds when abreast the coast between Tucker Beach and Absecon Lighthouses, special care is necessary not to be set on the shoals off Brigantine Beach." Page 59.

And again:

"Deep draft vessels should give the shore between Little ·Egg Inlet and Absecon Inlet a berth of over five miles." Id. p. 56.

It contains numerous other references to the danger of going too close to this coast with vessels of heavy draft, like the Soule. · It was plainly the part of good seamanship, under the conditions existing when the tow passed Northeast End Light, to keep well offshore; and that is what the officers of the tug meant to do, but failed. Was their failure negligent?

The shoal on which the barge stranded has been well known to navigators for many years. A buoy is placed outside it to indicate its location. There is no .evidence to support the suggestion of counsel for the claimant that there was a sudden change in its location or con-

formation. The master of the tug does not attempt to explain the accident on any such theory. His testimony is, in effect, that in coming a distance of about 24 miles to the north he got about 4 miles farther to the west than he intended to go.

There was nothing extraordinary in the weather, nothing sufficient to excuse such a mistake in navigation. I doubt if it was as thick as the men on the tug say it was. Her log says "Hazy" at 8 p. m. and also at 8:40 p. m., and "Quite Hazy" at 10:05 p. m. There is no mention in it of fog on this trip. The men on the barge say it was not foggy. Witnesses on the tug and on the barge testify that for a substantial time before the stranding lights on shore were visible. If so, it was possible to determine the distance from the shore. Witnesses on the barge testify that they noticed that they were farther inshore than usual. The fact was equally apparent from the tug.

For nearly an hour and a half before the stranding, the tug, according to her own log, had been getting soundings of less than 10 fathoms. The United States Coast Pilot advises that vessels on this coast keep outside the 20-fathom line, and that sailing vessels should go about and head offshore as soon as they strike 10 fathoms. Tows customarily go inside the 20-fathom line, but they mean to keep outside the 10-fathom line. Going inside the latter line under such weather conditions as prevailed on the night in question was perilous, and it was unnecessary. The soundings made on the tug indicated that she was nearer the shore than she ought to be. Her master testifies that he did not at any time suppose that the tow was far enough inshore to create a situation which could be called an emergency, and that he at no time put straight out to sea in a southeasterly direction, which, according to the Coast Pilot, is the proper course to get out of danger in that vicinity.

It is suggested for the tug that there must have been a temporary current of unusual and hitherto unknown character which set the tow towards the land. There is, however, no evidence of the existence of any such current, either at that time, or before, or since. An onshore current there in northeasterly winds is well known; navigators are warned against it in the Coast Pilot. The heavy ground swell and this onshore current, in connection with the unusual draft of the barge, probably set the tow towards the land faster than the master or mate of the tug appreciated; and in setting the course they did not make sufficient allowance for the leeway due to those causes. There was, however, nothing about the conditions which an experienced and careful navigator ought not to have appreciated and guarded against; and there seems to me to have been warning of the danger, both in the appearance of the lights on shore and in the soundings. It was the duty of the tug to exercise a high degree of care for her tow; and the fact that, in weather of no extraordinary severity or difficulty, she stranded the barge on a well-known and charted shoal, strongly suggests negligence on her part.

If the Harter Act does not apply, I feel obliged, upon all the evidence, to hold the tug solely at fault for the accident.

[2] The claimant contends that under the Harter Act the tug and

barge are to be treated as a single vessel, that both were seaworthy and were properly manned, equipped, and supplied, and that they and their owner are therefore exempted from liability for faults or errors in navigation, or in the management of the tug. 27 Stat. 445.

The tug and barge both belong to the same person. The claimant contends that both were chartered together, as one vessel. Mr. Van Der Bergh, who acted for the claimant, testifies that this was the arrangement which he made over the telephone with Mr. Ward. Mr. Ward, however, does not so recollect the talk. He testifies that the agreement covered only the barge Soule. Both say that their conversation was previous to the letter by which the charter was finally completed. In the claimant's letter to the libelant, dated May 4, 1914, it was said:

"The Coastwise, with barge New Jersey, arrived in New Bedford yesterday morning and is now en route south with one outside barge, also barge Soule for Sewall's Point. We hope that you will be in a position to load the Soule ere she arrives south."

On May 5th the claimant again wrote:

"The barge Soule, under tug Coastwise, is now en route to Hampton Roads, as yet unchartered."

This last letter apparently crossed in the mail one from the libelant dated May 5th, in which he says:

"Have Enos Soule report at News for West Va. Coal Co. loading."

In this letter closing the charter nothing is said about the Coastwise. It is not frequent to tie a tug to a barge by a charter, although it is sometimes done. Upon all the evidence, I do not think that the agreement under which the Soule was chartered included the Coastwise. I think, and I find, that the claimant was free to tow the Soule up the coast by any tug at its disposal.

The libelant contends that the tug was not powerful enough to handle such a deep and heavy barge as the Soule, that she was not therefore properly equipped for the work in hand, and that on this account the case is not within the provisions of the Harter Act. There is testimony that the Coastwise had sufficient power to tow the Soule under any ordinary conditions. The only substantial evidence to the contrary is the fact that she did not pull the barge clear. She apparently never tried to go right out to sea, and failed to make headway because of her lack of power; and she made fair progress before the stranding. Her captain at some point, and I think very shortly before the stranding, did, as he says, change his course to an easterly one; and still they did not get clear. I do not think that fact alone sufficient to indicate a lack of power in the tug. It is possible, perhaps probable, that the barge stranded on the way out. I do not attach much importance to the testimony as to the tug's power, given by the captain of the barge, who, so far as appears, never navigated on the tug at all. I do not think it is made out that the tug was lacking in sufficient power for the purpose in hand. In all respects the tug and barge were seaworthy, and were properly manned, equipped, and supplied.

The case thus presents this question: The owner of a barge charters her to carry a cargo between two ports. He provides a tug, also belonging to him, to tow her. Both barge and tug are seaworthy, and are properly manned, equipped, and supplied. The barge and her cargo are totally lost by negligence in operating the tug. Does the Harter Act relieve the tug from liability? As an original question, I should regard this as a doubtful, as it certainly is an important, one; but I think it has been closed, so far as this court is concerned, by the decision in Baltimore & Boston Barge Co. v. Eastern Coal Co. (C. C. A. 1st Circuit) 195 Fed. 483, 115 C. C. A. 393. In that case a barge, which had been chartered to the owner of the tug, was lost by the negligence of the tug. The owner of the cargo on the barge made a claim against the tug. The Harter Act was set up in defense. It was held both by the District Judge and by the Circuit Court of Appeals that the Harter Act did not apply. The question decided is thus stated in the language of the learned District Judge in his opinion on that case:

"The question then presented is: May an owner of a tug have the benefit of the act, as against damage through negligence on the part of his tug, in towing a barge under charter to him, loaded with cargo which he, thus controlling the barge, has agreed to carry in her?" Dodge, J., The Murrell (D. C.) 200 Fed. 826, page 829.

It was explicitly pointed out by the Circuit Court of Appeals that there was no distinction, upon the point under discussion, between full ownership of the barge by the owner of the tug and ownership pro hac vice by charter.

I see no sound distinction between that case and this one. I therefore rule that, upon the facts found, the Harter Act does not exempt the tug from liability. There must be a decree for the libelant, and the case must be referred for assessment of damages.