## SACRAMENTO NAVIGATION COMPANY *v.* SALZ.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 51.  Argued December 2, 3, 1926.—Decided February 21, 1927.

1. A contract for the transportation of cargo shipped on board a barge, with privilege to the carrier of reshipping, in whole or in part, on steamboats or barges and of towing with one steamer two or more barges at the same time, is a contract of affreightment, in which it is necessarily implied that the barge as a means of transportation will be used in conjunction with a steamer or tug, to be furnished by the carrier, the two constituting together the effective instrumentality.  P. 328.

2. In such case, the barge and the tug together constitute the "vessel transporting merchandise or property" within § 3 of the Harter Act.  P. 330.

3. The rule of strict construction is not violated by permitting the words of a statute to have their full meaning or the more extended of two meanings.  P. 329.

3 F (2d) 759, reversed.

CERTIORARI (268 U. S. 683) to a decree of the Circuit Court of Appeals which affirmed a decree of the District Court in favor of Salz, the present respondent, in a suit *in personam* brought by him to recover for the loss of a cargo of barley while it was being towed by the petitioner under a contract of affreightment.

*Mr. Louis T. Hengstler,* with whom *Messrs. H. H. Sanborn* and *Frederick W. Dorr* were on the brief, for the petitioner.

*Mr. Carroll Single,* with whom *Mr. S. Hasket Derby* was on the brief, for the respondent.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This appeal involves the construction and application of § 3 of the Harter Act, c. 105, 27 Stat. 445, which, so far as pertinent here, provides: " That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel . . ."

Petitioner is a common carrier on the Sacramento River in California and owns and operates the barge " Tennessee," which is not equipped with motive power, and the ·steamer " San Joaquin No. 4." On September 23, 1921, petitioner received from respondent for transportation a quantity of barley in sacks. The bill of lading acknowledges shipment of the barley " on board of the Sacramento Transportation [Navigation] Co.'s. Barge ' Tennessee ' . . . ; with the privilege of reshipping in whole or in part, on steamboats or barges; also with the privilege of towing with one steamer, at the same time, . . . two or more barges, either loaded or empty." While being towed by the steamer in the course of transportation, the barge came into collision with a British ship at anchor and was swamped. The barley was a total loss. The sole cause of the collision was the negligence of the steamer. That both barge and steamer were " in all respects seaworthy and properly manned, equipped, and supplied," is not in dispute. Upon these facts, respondent filed his libel *in personam* against petitioner.

In the view we take of the case the sole question to be determined is whether the barge alone or the combina-

tion of tug and barge was the " vessel transporting " the barley, within the meaning of the Harter Act. This question is a nice one, and the answer to it is by no means obvious. The court below thought the contract was between the respondent and the barge, and did not include the tug; that since the barge had no power of her own, there was an implied contract that a tug would be furnished to carry her to her destination; and that the Harter Act should receive a strict construction and, so construed, it applied only to the relation of a vessel to the cargo with which she was herself laden—that is to say, in this case, the barge alone. The decree of the district court for respondent, accordingly, was affirmed. 3 F. (2d) 759.

The libel recites that it is " in a cause of towage," and in argument this is strenuously insisted upon. Towage service is the employment of one vessel to expedite the voyage of another. Here, while there was towage service, the contract actually made with respondent was not to tow a vessel but to transport goods, and plainly that contract was a contract of affreightment. See *Bramble v. Culmer,* 78 Fed. 497, 501; *The Nettie Quill,* 124 Fed. 667, 670. Respondent's contention, however, seems to be that the shipping contract as evidenced by the bill of lading was with or for the barge alone; but that when petitioner took the barge in tow an implied contract of towage with respondent at once arose. This view of the matter, we think, is fallacious.

The fact that we are dealing with vessels, which by a fiction of the law are invested with personality, does not require us to disregard the actualities of the situation, namely, that the owner of the tug towed his own barge as a necessary incident of the contract of affreightment, and that the transportation of the cargo was in fact effected by their joint operation. The bill of lading declares that the cargo was shipped *on board* the barge.

But it was to be transported; and this the barge alone was incapable of doing, since she had no power of self-movement. It results, necessarily, that it was within the contemplation of the contract that the transportation would be accomplished by combining the barge with a vessel having such power. Respondent says there was an implied contract to this effect;—that is, as we understand, a distinct contract implied in fact. But a contract includes not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made, 3 Williston on Contracts, § 1293; *Brodie* v. *Cardiff Corporation*, [1919] A. C. 337, 358; and there is no justification here for going beyond the contract actually made to invoke the conception of an independent implied contract.

Considering the language of the bill of lading in the light of all the circumstances, it is manifest that we are dealing with a single contract and the use of the tug must be read into that contract as an indispensable factor in the performance of its obligations. To transport means to convey or carry from one place to another; and a transportation contract for the barge without the tug would have been as futile as a contract for the use of a freight car without a locomotive. In this view, by the terms of the contract of affreightment, in part expressed and in part necessarily resulting from that which was expressed, the transportation of the goods was called for not by the barge, an inert thing, but by the barge and tug, constituting together the effective instrumentality to that end.

It is said that the Harter Act is to be strictly construed. *The Main* v. *Williams*, 152 U. S. 122, 132. Even so, the rule of strict construction is not violated by permitting the words of a statute to have their full meaning, or the more

extended of two meanings. The words are not to be bent one way or the other, but to be taken in the sense which will best manifest the legislative intent. *United States* v. *Hartwell,* 6 Wall. 385, 396; *United States* v. *Corbett,* 215 U. S. 233, 242. In the light of the decisions presently to be noted, the words, a "vessel transporting merchandise," etc., are entirely appropriate to describe the combination now in question, and we see no reason to think that Congress intended that they should not be so applied. This court and other federal courts repeatedly have held that such a combination constitutes, in law, one vessel. See *The Northern Belle,* 9 Wall. 526, 528–529; *The "Civilta" and the "Restless,"* 103 U. S. 699, 701; *The Nettie Quill, supra; The Columbia,* 73 Fed. 226; *The Seven Bells,* 241 Fed. 43, 45; *The Fred. W. Chase,* 31 Fed. 91, 95; *The Bordentown,* 40 Fed. 682, 687; *State* v. *Turner,* 34 Ore. 173, 175–176.

In *The Northern Belle, supra,* this court, speaking of a combination of barge and steamboat, said that " the barge is considered as belonging to the boat to which she is attached for the purposes of that voyage." In *The "Civilta" and the "Restless," supra,* a tug and a ship which she was towing by means of a hawser were held to be in contemplation of law " one vessel, and that a vessel under steam."

In *The Columbia, supra,* it was held that a barge having no motive power and a tug belonging to the same owner and furnishing the motive power constituted one vessel for the purposes of the voyage. In that case, wheat was to be transported by means of the barge, and the owner of the barge and tug undertook the transportation. The court said (p. 237): "As the wheat was to be carried on board the barge, which had no motive power, of necessity such power had to be supplied by the carrier. . . . When the tug made fast and took in tow the barge, to perform the contract of carriage, the two became one

vessel for the purpose of that voyage,—as much so as if she had been taken bodily on board the tug, instead of being made fast thereto by means of lines." It was, accordingly, held that, without surrendering both vessels, the owner was not entitled to the advantages of Revised Statutes § 4283 *et seq.,* providing for a limitation of liability of " the owner of any vessel," etc.

The court below rejected this decision as not applicable .o a case arising under the Harter Act; but it is hard to see why the case is not pertinent and, if sound, controlling. What we are called upon to ascertain is the meaning of the term " any vessel," and the point decided in that case is that it includes a combination identical in all respects with that here dealt with. True, the court there, in construing the phrase, " the owner of any vessel," was considering one statute while here we are considering another and different statute; but there is no such difference between the statutes in respect of the connection in which the phrase is used or in respect of the subject-matter to which it relates as to suggest that Congress intended that it should bear different meanings.

Respondent contends that his view to the contrary is sustained by *The Murrell,* 195 Fed. 483, affirming 200 Fed. 826, and *The Coastwise,* 233 Fed. 1, affirming 230 Fed. 505. Some things are said in those cases which, if we should not consider the differences between them and the present case, might justify this contention. The most important of these differences is that in both cases it was held that contracts of towage and not of affreightment were involved. We do not stop to inquire whether this conclusion as to the nature of the contracts was justified by the facts. It is enough that it was so held and this holding was the basis of the decisions. Here, upon all the facts, as we have just said, the contract upon which respondent must rest is one of affreightment, the obligation of which is to carry a cargo not to tow a vessel.

*Liverpool, &c. Nav. Co.* v. *Brooklyn Term'l,* 251 U. S. 48, also relied upon by respondent, is not to the contrary. There the libel was for a collision with petitioner's steamship, the moving cause of which was respondent's steam tug, proceeding up the East River, with a loaded car float lashed to one side and a disabled tug to the other, all belonging to respondent. The car float came into contact with the steamship; but the court said it was a passive instrument in the hands of the tug and did not affect the question of responsibility. The controversy arose upon a claim to limit liability, petitioner contending that the entire flotilla should have been surrendered. This court held that it was necessary to surrender only the active tug, saying " that for the purposes of liability the passive instrument of the harm does not become one with the actively responsible vessel by being attached to it." But this is far from saying that the entire flotilla might not be regarded as one vessel for the purposes of the undertaking in which the common owner was engaged at the time of the collision. The distinction seems plain. There the libel was for an injury to a ship in no way related to the flotilla. It was a pure tort—no contractual obligations were involved; and the simple inquiry was, What constituted the " offending vessel "? Here we must ask, What constituted the vessel by which the contract of transportation was to be effected? a very different question. If the British ship which here was struck by the barge were suing to recover damages and a limitation of liability were sought by the owner of the tug and barge, the *Liverpool* case would be in point. But the present libel is for a loss of cargo and falls within the principle of *The Columbia, supra,* where, upon facts substantially identical with those here, a surrender was required of the combined means by which the company undertook the transportation of the cargo.

*Decree reversed.*