## THE ALBEMARLE.

## THE HAMILTON.

District Court, D. Maryland. November. 17, 1927.

No. 1427.

**1. Collision ⊜⇒35—Where two steam vessels are approaching each other obliquely on same general course, one having the other on her starboard side is burdened vessel.**

Where two steam vessels are approaching each other obliquely on the same general course, the one having the other on her starboard side is the burdened vessel, and under duty to keep out of the way under the starboard hand rule, and the other to hold her course and speed.

**2. Collision ⊜⇒95(1)—One of two tugs with tows held solely in fault for collision between the tows in Baltimore harbor.**

Collision between tows of tugs Hamilton and Brandywine in Baltimore harbor on a clear day, with smooth water and light wind, held due solely to the fault of the Brandywine, which left her pier with a long barge alongside, while the other tow was passing to the starboard and proceeded in the same general direction, but on

an oblique course to that of the Hamilton until her barge came into collision with the rear lighter in the Hamilton's tandem tow.

**3. Collision ☞76—Vessel ahead not required to give signals to following vessel, which has not signaled.**

A vessel is under no duty to give a signal to another coming up from astern of her, and which has given no signal, and where the way is clear.

In Admiralty. Suit for collision by the Southern Transportation Company, owner of the wooden barge, Albemarle, against the steam tug Hamilton. Decree dismissing libel.

Samuel K. Dennis, of Baltimore, Md., for libelant.

Clifton S. Brown, of Baltimore, Md., for respondent.

COLEMAN, District Judge. This is a libel arising out of a collision on March 15, 1926, in Baltimore harbor, between the barge Albemarle, in tow alongside the tug Brandywine, and the last of five scows or lighters being towed in tandem by the tug Hamilton. The libel is properly brought against the tug alone, because under the circumstances the tug was responsible for the proper navigation of the tow. Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591.

The collision occurred in the afternoon of a clear day, with light wind. The tide, also, was not a factor. The Hamilton, with her tow, was proceeding up the channel. Each of her five empty lighters was 92 feet long. The Hamilton herself was 74 feet long, and had out some 63 feet of hawser. All of the lighters were lashed closely together, in anticipation of being swung into coal piers for loading. The tug Brandywine was made fast to the starboard side aft of the Albemarle, the latter being 165 feet in length, and the Brandywine 65 feet, so that some 100 feet of the scow were in advance of the bow of the tug. The Albemarle was heavily laden with phosphate. The Brandywine, with her tow, had left a pier on the west, or opposite, side of the harbor, and was destined up the harbor to a point on the same side, but somewhat beyond the destination of the Hamilton. The starboard bow of the Albemarle came in contact with the port side of the fifth, or last, scow about 15 feet from her stern, with the result that the barge's stem was broken away, necessitating repairs aggregating some $1,300, as is claimed.

Briefly stated, the claim of the libelant is that the Hamilton and her tow were negligent, in that they swung to port and crossed, or attempted to cross, the bow of the Brandywine and her tow, contrary to the rules governing the right of way. On the other hand, the claim of the respondent is that the tug Hamilton and her tow did not vary from their proper course as alleged, but that the proximate cause of the collision was the fact that the Brandywine with her barge, being the overtaking and therefore the burdened vessel, failed to yield the right of way, came too close on the port side of the tandem of scows, and, finding it impossible to pass astern of the last one, had to stop and reverse, with the result that the Albemarle's bow was swung to starboard and against the last scow.

[1, 2] Out of a mass of confusing testimony, a great deal of it irreconcilably conflicting, produced by 15 witnesses, 9 of whom claim to have been eyewitnesses to the collision, the following additional facts appear to be established by the weight of the evidence. Both tugs, with their respective tows, were proceeding at approximately the same rate of speed, namely, between two and three miles per hour. The Brandywine was first sighted by the Hamilton when the former was still at her pier across the harbor. At that time the Brandywine must have been more than two points abaft the beam of the Hamilton herself, and about 1,200 yards distant from her, according to the then location of the Hamilton as testified by her master and indicated on the chart, which testimony is not contradicted. The Brandywine was not noticed again by any one on the Hamilton or her tow until the watchman on the third scow saw her a few moments before the collision. Those on board the Brandywine appear not to have realized or reckoned with the close proximity of the Hamilton and her tow until she, the Brandywine, was abreast of the third scow, which was only some 200 or 250 feet distant, to starboard. The Hamilton did not slacken her speed to shorten her hawser, so that she might more easily take her tow to the coal piers, until after the collision. It does not appear that when the collision occurred the length of hawser was excessive. Neither vessel gave any signals to the other. The master of the Brandywine held only a second-class license, although he had followed the water for 40 years. He admitted he was at least partially blind in his right eye. The master of the Hamilton had a first-class license, and had been a mariner for 25 years.

Reference to the chart shows that the Hamilton's proper course was about northwest, and that of the Brandywine was approximately due north. Plotted on the chart, it appears that these courses, being converging ones, would intersect each other at or

about the point where all the witnesses agreed the collision occurred. The Brandywine was always more than two points abaft the Hamilton's beam, and probably was also always in a similar position in relation to the entire length of the Hamilton and her tow, if treated as one vessel, but probably never as much as two points abaft the beam of the last scow. The overtaking rule (article 24 of the Inland Rules and rule VI of the Supplementary Rules) is as follows:

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel can not always know with certainty whether she is forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way."

Recognizing that under certain conditions a tug and her tow are to be considered one vessel (Sacramento Navigation Co. v. Salz, 273 U. S. 326, 47. S. Ct. 368, 71 L. Ed. 663), it is nevertheless not necessary to decide whether the compass bearing, which is the basis of the overtaking rule, shall be considered in relation to the tug only, to the entire length of the tow, or to the last tow, because it is really not necessary to rest this case upon the overtaking rule, since it falls clearly within the starboard hand rule (article 19, Inland Rules), and more particularly rule VII of the Supplementary Rules, which is as follows, and which specifically explains the application of the starboard hand rule to a situation such as here existed:

"When two steam vessels are approaching each other at right angles or *obliquely* so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

"If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

The Brandywine was, therefore, the burdened vessel, and the Hamilton the privileged one; so it was the duty of the Hamilton to hold her course and speed and for the Brandywine to keep out of her way by going to starboard, so as to cross the stern of the Hamilton's tow, or slacken her speed, or stop, or reverse. The claim on the part of the Brandywine's master and her crew that the Hamilton changed her course, and made a turn to port just before the collision, is not supported by the weight of the evidence or by the admitted position of the vessels just after the collision. It appears that the Brandywine did stop and reverse her engine, but too late. However, it is not proper to conclude therefrom that the Brandywine was solely at fault, until an understanding is had of the full meaning of Rule VII as above quoted. Note the clause in that rule to the effect that: "If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, * * *" etc. This clearly presupposes that signals shall be given and answered; in other words, rule I and rule III of the Pilot Rules must be read in conjunction with any complete interpretation of rule VII.

Rule I is as follows: "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle, the danger signal."

Rule III is as follows: "The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting head and head, or nearly so, but at all times, when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

Lastly, we must bear in mind article 29 of the Inland Rules, which is as follows: "Nothing in these rules shall exonerate any vessel, or the owner or master or crew there-

of, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

[3] Are we to conclude from these rules that, under such circumstances as existed in the present case, it was the duty of the privileged vessel, namely, the Hamilton, to give a warning to a vessel some 400 feet at least astern of her, which vessel did not herself sound any signal? The court feels that such is not a° reasonable interpretation. Some importance must be attached to the fact that these vessels were not restricted by an especially narrow waterway or other craft. There was adequate deep water on all sides. The respective duties of the vessels might, of course, have been different, had they been approaching each other at night, in a fog, in a narrow, crowded channel, or where the tide was a factor. The master of an overtaken vessel, receiving no signal from the overtaking vessel, is not required to look astern before changing his course, however abruptly. The M. J. Rudolph (C. C. A.) 292 F. 740. A fortiori, the court feels that in the present case the master of the Hamilton was under no obligation to warn the Brandywine, coming up behind her, and which had not given him a signal herself, because the only purpose of such warning would be to tell the master of the Brandywine that he should do what the Pilot Rules required him to do, and which the master of the Hamilton had a right to assume he would do of his own initiative.

The court is not unmindful of the fact that the poor eyesight of the master of the Brandywine may have been a strong contributing, although nonexonerating, factor in the collision. But we need not rest the case here, because it is incredible, making all due allowance for his impaired vision, that he, as he testified, did not pay any real attention to the Hamilton or her tow until about 250 feet away. It was his clear duty to watch them continuously as he approached them, because his was the burdened vessel. This being true, and the master of the Hamilton being under no obligation to look astern, the Brandywine must be held to have been solely at fault. Certainly her negligence was gross, and any doubts regarding the management of the Hamilton, or of the contribution of her faults, if any, to the collision, should, under such circumstances, be resolved in her favor. The M. J. Rudolph, supra. See, also, The Lizzie M. Walker (C. C. A.) 3 F.(2d) 921.

The libel must therefore be dismissed.