### THE McALLISTER BROS.

### THE EMPIRE NO. I.

### THE CORTLANDT.

### THE ELIZABETH A. CONWAY.

### THE MAUDE L. FOSTER.

### THE M. A. LENAHAN.

Nos. 14676, 14730, 14571, 14640.

District Court, E. D. New York. Feb. 8, 1937.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for Michael J. Derby.

John R. Stewart, of New York City (John G. Donovan, of New York City, of counsel), for New York Scow Corporation.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for steamtug McAllister Bros.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for steamtug Cortlandt.

GALSTON, District Judge.

By order of the court these four causes were consolidated.

Three barges were damaged, as were also the cargoes of rubber and sardine meal on the Maude L. Foster.

On October 27, 1934, the tug McAllister Bros. and the Empire No. 1 had ten barges in tow, made up in five tiers of two abreast. The McAllister Bros. was the leading tug and the Empire No. 1 assisted. The two left its terminal at Albany and proceeded down the river with the Empire No. 1 holding up the stern of the tug. The length of the tow was about 500 feet. The barges were properly made up with two hawsers, a hawser on each corner. Going down the river they passed the steamer Georgian and when the Cortlandt and her tow were coming up the river the McAllister Bros. tow was about 200 feet off the Albany shore, which was on her starboard.

At that time the Empire No. 1 had come up to the McAllister Bros. and was alongside of her. The tow was straightened out at a point just below the southerly end of the grain elevator. At that time the Cortlandt heading up was below the turning basin on the Rensselaer side of the river, on her own starboard side, and about 200 feet off the Rensselaer bank. The McAllister Bros. then sounded a one whistle signal which was answered by the Cortlandt with a one whistle signal. If the two tugs had continued their respective courses, they would have passed clearly without collision.

As the two tows approached each other, the port bridle between the Cortlandt and the Maude L. Foster, the first barge in the Cortlandt's tow, parted. Shortly thereafter the second part of the bridle also parted. The barges in the Cortlandt tow sheered towards the McAllister Bros. tow. When the master of the McAllister Bros. saw this, he threw his wheel hard to port and went as close as possible to the Albany side, and then before the collision he threw the wheel hard to starboard in order to dispose his tow at an angle to clear the oncoming head barge of the Cortlandt. Collision resulted between the Maude L. Foster and the McAllister Bros. tow, at a point over 3,000 feet south of the place on the river at which the McAllister Bros. passed around the Georgian's stern.

The time of the collision was about the first of the flood tide running at about half a mile an hour. The weather was clear.

The testimony of Hauffman, an independent witness, who on the day in question was acting as pilot on the steamship Georgian, is important. As he was maneuvering the Georgian in the river, he saw the McAllister Bros. tow about 1,000 feet above him, bound down, and received first a starboard whistle from the McAllister Bros. That he could not answer owing to the fact that his bow was fast to the dock and there was plenty of room for the tow to pass under his stern, i. e., between the stern of the Georgian and the Rensselaer side. He estimated the distance between the stern of the Georgian and the Rensselaer side at 400 feet. At that time he noticed a tow coming from the other direction. Hauffman testified that after the McAllister Bros. tow rounded his stern the McAllister Bros. pulled over towards the Albany side, and he corroborates the story told by the McAllister Bros. people. The McAllister Bros. tow had straightened out when one of the barges of the Cortlandt tow took a sheer towards the McAllister Bros. barges.

The Cortlandt contends that the McAllister Bros. was farther from the Albany side, indeed on the Cortlandt side of the water, and that after the exchange of one whistle signals the McAllister Bros. failed to get over far enough to the starboard, at least not sufficiently far to swing the tail

of her tow out of the path of the Cortlandt. The Cortlandt then in an endeavor to get nearer to the Rensselaer side and to avoid collision pulled her wheel hard over, and hooked up her engines. When the strain came on the hawser, it parted and the boats continued on to collision.

The weight of the credible testimony is in favor of the version of accident as related by the McAllister Bros. witnesses and the fault must be ascribed either to improper navigation of the Cortlandt or to a defect in the bridle hawser. Accordingly, I hold the McAllister Bros. and the Empire No. 1 free from fault. The damage to the barges must be ascribed to the fault of the Cortlandt. The Elizabeth M. Baker (C.C.A.) 69 F.(2d) 54.

There remains for consideration the question of liability for cargo damage. The tug Cortlandt and the barge Maude L. Foster were jointly operated by W. E. Hedger Transportation Corporation, the contracting carrier of the goods, and were engaged in the transportation of merchandise between two ports of the United States. The Cortlandt is entitled, therefore, to the benefits of the Harter Act, 46 U. S.C. §§ 190–195 (46 U.S.C.A. §§ 190–195); In re O'Donnell (C.C.A.) 26 F.(2d) 334, and Sacramento Nav. Co. v. Salz, 273 U. S. 326, 47 S.Ct. 368, 71 L.Ed. 663.

So far then as liability for damage to the cargoes is here concerned, the inquiry is limited to the question as to whether the Cortlandt was properly equipped. It was conceded at the trial that the crew was competent and qualified and the tug properly manned. No question was raised about the fuel nor the lighting. If the equipment was proper and adequate then the Cortlandt is free from liability with respect to cargo damage. The Cortlandt was equipped with two sets of canal hawsers and one set of river hawsers and dock lines, head lines, stern line, and a spare of each. It was testified that the hawsers were in good condition. In fact the river hawser, though it had been used on four previous round trips, was practically new, was the testimony of the master of the Cortlandt. That the hawser must have been in good condition may be inferred from the fact that though the severed parts were given to the libelant, the 400 feet which remained were spliced and used for the balance of the season in towing on the river. No trouble was encountered with them. There were four 200 feet canal hawsers and a river hawser of 500 feet. Each was a 5-inch line.

From all the testimony in the case, it would seem that this was an adequate equipment of lines. Indeed, Connelly, an expert called on behalf of the United States Rubber Products Company, admitted that he had used 5-inch lines, though he did say that a 5½-inch line would be "plenty small enough." Oliver, superintendent of operations of the Cornell Steamboat Company, another witness called by the United States Rubber Products Company, criticized a bridle tow in the river. He said that the customary way of towing on the Hudson river with the type of barges involved in this case was on two hawsers. But how the lines are to be used is a matter for the judgment of the captain. Oliver said that it was not their practice to interfere with the captain with respect to how he arranges his lines. He admitted that if a tug has two sets of canal hawsers and if she wants to use them in the river that that is all right. The election of the captain of the Cortlandt to use a bridle hawser cannot support the cargo damage claims. At most such choice was an error in navigation for which the claimant must be excused under the provisions of the Harter Act. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241.

Decrees will be entered in accordance with the foregoing opinion. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.