## THE MARMOR.

## THE CATHERINE.

### TONAWANDA IRON CORPORATION v. THE MARMOR et al.

District Court, S. D. New York.

July 19, 1944.

James Neil Senecal, of New York City, for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of counsel), for claimant and respondent.

CONGER, District Judge.

Suit by libellant Tonawanda Iron Corporation against the Steamtug Marmor (Suburban Petroleum Transport, Inc., owner and claimant) and the Harbor Towboat Company for damages sustained by libellant to a shipment of pig iron. The pig iron had been loaded on the barge Catherine at Tonawanda, N. Y., for shipment to Jersey City, N. J. The barge was being towed by the tug Marmor and while being so towed it came in contact with the center abutment of the railroad bridge at North Tonawanda and sunk. Libellant was compelled to raise and salvage this shipment and it is for cost and expense incurred therefor that it sues.

As to the barge Catherine, libellant concedes that it was seaworthy, properly manned and equipped.

The claimant and owner of the tug Marmor admits that the collision and resultant sinking of the barge was due to the negligence of the tug.

Without any other circumstances intervening the logical conclusion would be a decree in favor of libellant but claimant pleads exoneration by reason of § 3 of the Harter Act, 46 U.S.C.A. § 192. Under this Act, as applicable to this case, and if claimant has the benefit of the provision of said § 3, claimant would not be liable for the damage resulting from any fault or error in the navigation or management of the tug, provided that the owner of said tug had exercised due diligence in making the tug seaworthy in all respects and properly manned, equipped, and supplied prior to the commencement of the voyage.

If claimant is to have any relief it must come through the paper Exhibit B, which is entitled "Bill of Lading," and provides for the shipment of the pig iron via the barge Catherine. This paper was signed by libellant and one Hoffman, an agent for the Harbor Towboat Company, Inc., at Buffalo, New York.

After the shipment had been loaded, this paper was delivered to libellant. The contention of libellant is that this so-called bill of lading is nothing more than a receipt of the goods to be shipped; that there was before that, a contract of affreightment between the parties (libellant and the Harbor Towboat Corporation); that this contract existed before the merchandise was shipped, and before the bill of lading was delivered to libellant. As the evidence showed, this claimed contract was oral and no reference therein was made to the Harter Act. I can't agree with libellant in this contention. The evidence disclosed simply a solicitation of business.

Certainly the special circumstances disclosed in Northern Pacific R. Co. v. American Trading Co., 195 U.S. 439, 25 S.Ct. 84, 49 L.Ed. 269, are not present here.

The evidence is not strong enough to hold that the parties entered into an express contract of such explicit terms that it would take the place and supplant the eventual contract of affreightment, the bill of lading.

The bill of lading contained a clause (2) that the shipment was subject to the terms of § 3 of the Harter Act. I have heretofore described § 3 as it applies to this case.

Under certain conditions a tug might take advantage of the terms of bills of lading similar to the one we have here, although the tug is not named therein. This has been so held where the tug and the barge were owned by the same person. See Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 369, 71 L.Ed. 663.

The following quotation from that case gives the reasons for such a holding: "Considering the language of the bill of lading in the light of all the circumstances, it is manifest that we are dealing with a single contract, and the use of the tug must be read into that contract as an indispensable factor in the performance of its obligations. To transport means to convey or carry from one place to another; and a transportation contract for the barge without the tug would have been as futile as a contract for the use of a freight car without a locomotive. In this view, by the terms of the contract of affreightment, in part expressed and in part necessarily resulting from that which was expressed, the transportation of the goods was called for, not by the barge, an inert thing, but by the barge and tug, constituting together the effective instrumentality to that end."

In this case, of course, there is no common ownership. The tug and the barge are separately owned. Claimant urges that the principle laid down in Sacramento Navigation Co. v. Salz, supra, should be applied here because the owner of the tug and the owners of the barge had a common interest in the undertaking; that they were engaged in a joint enterprise.

The testimony is that Harbor Towboat Company assembled a number of loaded barges to be towed to Buffalo. A written contract was entered into between Suburban Petroleum Transport, Inc., owner of the tug Marmor and Harbor Towboat Co., Inc., manager and operator of three of the barges, and Frank Egan, owner of the other three barges including the Catherine. In and by this agreement the Marmor was to tow the barges to Buffalo and further that after certain charges were deducted the net freight was to be divided; the owner of the tug to receive 60 per cent and the barges 40 per cent according to the tonnage carried by each barge.

■ The contract only covered the voyage westward. At the time it was executed these barges had no freight contract for the return trip. The end of the westward journey also terminated the relationship between the tug and the barges. However, James Dwyer of Harbor Towboat Company, Inc., through an agent in Buffalo obtained an offer (subsequently accepted) from the Tonawanda Iron Corporation to carry six cargoes of pig iron to New York. Mr. Dwyer testified he then consulted the General Manager of Suburban Petroleum Transport, Inc. (owner of the tug), concerning the offer and arrangements were made for the tug to tow the loaded barges back to New York. Both of these gentlemen testified that the same arrangement was made for the return trip; the net freight to be divided 60 per cent to the tug owner and 40 per cent to the barges. In other words, before the return trip was commenced the same contract was made verbally for the eastward voyage that had been made in writing for the westward voyage. I see no objection to this. I know of no law which says such an agreement must be in writing. It gets down to a question of credibility. I see no reason to doubt the testimony of these two men.

Claimant in support of its contention relies on In re O'Donnell et al., 2 Cir., 26 F. 2d 334. That case turned upon the doctrine laid down in Sacramento v. Salz supra. In the O'Donnell case, supra, there was not common ownership but there was a seasonable contract between the owner of the barges and the owner of the tug; the freight to be divided at the end of the year. I can't see that that fact in any way changes the situation. Whether the contract is for a season, a round trip or a one way trip makes no difference.

It seems to me that this case on its facts comes fairly within the doctrine laid down in Sacramento Nav. Co. v. Salz, supra, as extended in Re O'Donnell, supra. See also The Vale Royal, D.C., 51 F.Supp. 412, 1943 A.M.C. 1099.

■ In order to come within the exemption of § 3 of the Harter Act the owner and claimant herein must show due diligence to have been exercised to make the tug seaworthy at the commencement of the voyage.

■ I think the evidence in this respect is sufficient. There was no testimony as to a special examination or survey of the tug just prior to commencing the eastward trip but there was testimony that the tug was all right at the end of the westward trip; that she handled the six barges going out all right; that there was no insufficiency of power; that she took the six loaded barges up the Niagara River (a rather strenuous trip); that at the time of the accident the tug was steering well and answered her rudder. As a matter of fact, and while this is not the determining factor, the record is barren of any evidence of any specific defect in the tug which would render her unseaworthy.

The proof is that the tug was acting all right when she took the barge in tow and all right at the time of the accident.

The state of facts as to seaworthiness seems to be almost as disclosed in the O'Donnell case, supra.

In addition there was testimony as to the experience and competency of the officers and men operating the tug.

There was also evidence that claimant had purchased the tug in 1941 for $15,000 and had thereafter spent $10,000 in repairing her hull and machinery. These repairs were completed not long before this accident.

■ Libellant raises a further objection to the tug being entitled to the benefits of the Harter Act. Libellant contends that the voyage had not commenced; that at the time of the accident the tug was performing a towing service in getting the flotilla together. I find against libellant in this contention.

As a matter of fact the voyage was to begin from the dock of the Tonawanda Iron Corporation at North Tonawanda, N. Y. That is where it actually did start as far as the barge Catherine was concerned. The fact that the other barges were at Messina, 36 miles away, does not change the situation. The other barges had been loaded; the Catherine had not yet been loaded. In order to save time and for his own convenience the captain of the tug took the other barges to Messina, while the Catherine was being loaded. Then the tug took the Catherine in tow and left the docks at North Tonawanda. It was part of the voyage contemplated by the agreement between the parties.

Claimant and respondent are entitled to a decree dismissing the libel with costs.

Settle decree on five days' notice.