## THE MARY M.

## THE MARGARET M.

## CHAS. PFIZER & CO., Inc. v. CONNERS MARINE CO., Inc.

### No. 131–118.

District Court, S. D. New York.
June 5, 1947.

Bigham, Englar, Jones & Houston, of New York City (F. Herbert Prem and Henry N. Longley, both of New York City, of counsel), for libelant.

Purdy & Lamb, of New York City (Edmund Lamb and Thomas J. Irving, both of New York City, of counsel), for claimant-respondent.

KENNEDY, District Judge.

Libelant seeks to hold claimant-respondent Conners for the loss of a cargo of molasses on August 19, 1943, laden into the barge Mary M. shortly before she careened at what is known as the "sand dock" at Buffalo, New York, and also for a portion of the cargo of the barge Margaret M. which was jettisoned as a result of the careening of Mary M. As I have indicated in the findings of fact, I believe that libelant has sustained its burden (Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62

S.Ct. 156, 86 L.Ed. 89) to prove that Mary M., operating under a contract of private carriage, was unseaworthy when she broke ground. The physical condition of Mary M. at the time lading was commenced, and the fact that shortly after it was terminated she careened and sank in calm water, make it highly probable that the unseaworthy condition of the barge was, as I have found, the proximate cause of the disaster. I am not here left in doubt on this point, as Judge Leibell was in the Commercial Corp. case. The T. N. No 73, 1939 A.M.C. 673 not officially reported. It is suggested by claimant-respondent Conners that the failure of the bargee to operate his pumps during the lading may have been at least one proximate cause of the disaster, but I reject the suggestion. Everything indicates that, although the bargee did not pump on that day, he was constantly at his post while the molasses was being taken aboard, and during the short voyage afterward to the assembly point for the New York voyage. It is, therefore, likely that he would have noticed any gradual increase of water in the hold of the barge. And the circumstances of the sinking itself point very strongly not to a gradual seepage of water, but rather to a comparatively sudden flooding of the hold. In other words, even though Mary M. had carried cargo in safety on voyages shortly prior to her last, she seems to have "faded away" under conditions that any seaworthy barge in this service would be called upon to meet.

■ If I am right in this, then there should be no limitation of liability (Cullen Fuel Co. v. W. E. Hedger, Inc., 1933, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189). Libelant urges that if Conners were entitled to limit, it would be necessary to surrender not only Mary M. but the other barges, three in number, and the tug, all in the same ownership and all engaged in the same enterprise, in order to satisfy the requirements of the limitation statute (Cf. Sacramento Nav. Co. v. Salz, 1927, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, approving and relying upon The Columbia, 9 Cir., 1896, 73 F. 226). I believe that all the barges and tugs were, in fact, engaged in a common marine enterprise, but, since I have denied limitation because the warranty of seaworthiness was breached, I do not reach the question of what it would be necessary to surrender if limitation were granted.

■ One more point, made by the claimant-respondent, deserves attention. On the day before the careening, Mary M. was casually inspected by a representative of the insurance carrier, which was about to assume, and did assume, the risk both on hull and on cargo. It is apparent that prior to suit the cargo underwriter "loaned" libelant Pfizer some very large percentage of its loss. Cf. Luckenbach v. W. J. McCahan Sugar Refining Co., 1918, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522. Conners, therefore, urges that the inspection was made by an agent of the real party in interest (the cargo underwriter) and operates as a waiver, or perhaps as an estoppel, to nullify the warranty of seaworthiness. The story of the inspection itself, and the circumstances under which it was made, indicate to me at least that there was no intention on the part of anybody that it should have the legal result now ascribed to it. To call that inspection casual would be to understate the matter. It certainly would not have revealed latent defects. And, apart from that, there is no inconsistency between such an inspection by a cargo underwriter, or a hull underwriter either, and insistence at the same time on the warranty of seaworthiness as between the principals to the contract of carriage. Nor is there any reason why an equivocal act like an inspection of that sort should whittle down rights under the warranty of seaworthiness, even in the absence of intention of the parties. I should think a rule like that would be detrimental to commerce.

Submit decree.

This suit having come on for trial in its regular order on the pleadings and proofs of the respective parties, and due deliberation having been had thereon, the Court makes the following:

## Findings of Fact

1. Charles Pfizer & Co. Inc., a New Jersey corporation (herein called Pfizer), has filed its libel against the barges Mary

M. and Margaret M. and their owner Conners Marine Co. Inc. (herein called Conners), to recover damages in the amount of $37,000 arising from the loss of cargo (to wit, molasses) laden into the barges mentioned at Buffalo, New York, on August 19, 1943.

2. The cargo was carried under a contract entered into between Conners and Pfizer on April 10, 1943, under which the former agreed for a term of seven years to transport molasses from Buffalo, New York, to Brooklyn, New York, in barges to be supplied by Conners.

3. In its answer and claim Conners admits the making of the contract; it alleges that Margaret M. and Mary M. were seaworthy at the time loading had been completed and that the disaster occurred without any neglect on the part of Conners, but resulted from an accident and danger of navigation.

4. Mary M. is a wooden barge 115.3 feet long, 35.4 feet wide, and 9 feet deep. Margaret M. is a wooden barge 117 feet long, 35.1 feet wide, and 8.8 feet deep. Both barges were originally built in 1921 for the brick trade. They were remodeled in 1933, at which time steel tanks were constructed on the deck of each barge. The outside walls of the tank rise from the deck to a height of approximately 7 feet 4 inches at the stern, 7 feet at the bow, and approximately 9 feet at the midship portion. The roof sections of the tanks are so constructed that they slope inward and upward. The whole roof surface is covered with flat hatch covers in 6 sections, 3 on the starboard side and 3 on the port side, each hatch cover being fitted above its corresponding compartment of the tanks.

5. The molasses trade east bound from Buffalo to New York is seasonal. It is a common practice, and in this instance that practice was carried out, to overhaul the barges engaged in that trade during the winter months.

6. In April 1943 Mary M. was overhauled while afloat. The wearing pieces of her rake timbers were renewed and some caulking was done on her. On April 16th she carried 607 gross tons of bauxite ore from New York to Oswego, making delivery on June 3, 1943. On June 29, 1943, she carried 760.31 tons of molasses from Buffalo to New York. On July 20, 1943 she carried 700 gross tons of bauxite ore from New York to Oswego, making delivery on August 11, 1943.

7. On August 11, 1943, the tug Dynamic, owned by Conners, towed the barges Margaret M., Mary M., Sarazen and Brewer, in that order, all barges being owned by Conners, from Oswego to Buffalo, arriving in the evening of August 17, 1943. The tug and barges had been sent to Buffalo by Conners to carry molasses in accordance with the contract described in Finding No. 2. The barges were towed singled out, and close coupled.

8. The cargo was to be taken on board at the Buffalo wharf of Tank Terminals Corp. (herein called the molasses dock). As the tug Dynamic and tow approached this place they made a round to on left rudder and moored Margaret M. with Mary M. astern of her, at the molasses dock. Sarazen and Brewer were then again taken in tow by the Dynamic, dropped down further to the south, and moored at a dock at the foot of Austin Street, Buffalo (herein called the sand dock).

9. The molasses dock consists merely of a platform 8 feet square jutting out from the Buffalo side of the Niagara River. Access to the shore is by means of a narrow catwalk running north from the loading platform. The loading platform, as such, has not enough mooring facilities for two barges. On the offshore side of the catwalk and near the south end of the loading platform are a series of piles which were used on the evening of August 17, 1943, as moorings for Margaret M. and Mary M.

10. During the night of August 17, 1943, during the entire day of August 18, 1943, and until the early forenoon of August 19, 1943, Margaret M. was the most northerly of the two moored barges. Her bow line was made fast to a mooring pile about 15 feet offshore from the northerly end of the catwalk and her stern line to the northerly side of the loading platform. The bow line of Mary M. was made fast to the southerly side of the loading platform and her stern line was carried out to

the bulkhead, the latter being at least 30 feet from the starboard side of Mary M.

11. The sand dock is 2,800 feet to the southward of the molasses dock. On the evening of August 17, 1943, after mooring Sarazen and Brewer at the sand dock, Dynamic returned to the molasses dock and took station on the inshore (starboard) quarter of Mary M. for the purpose of warning passing ships and thus preventing swell damage, notably damage to the molasses loading gear.

12. In the forenoon of August 18, 1943, two marine surveyors, Haug and Loeser, boarded both Margaret M. and the Mary M. as they lay alongside the molasses dock. The hull underwriter, represented by Loeser, was going off the risk at midnight of that day. Haug represented underwriters who were assuming the risk both on the hull and cargo at that time. Since the ballast water had not been completely discharged from the tanks, both surveyors decided to leave, after making some inspection of the barges. At about 5:00 p. m. on August 18, 1943, Haug returned and made another inspection of both barges. The charge for such inspection is $3, and the inspection was described as "casual" in the reports rendered to the underwriters. The barges were afloat at the time of inspection. The Dynamic was at the same time stationed on the starboard stern quarter of Mary M. The two barges were moored with the bow of Mary M. close to the stern of Margaret M. So far as inside inspection of the corners was concerned, the inspectors merely climbed down the lazarette deck and looked over its edge. Both barges were passed as safe for cargo on the evening of August 18, 1943.

13. In the early forenoon of August 19, 1943, Dynamic reversed the positions of Mary M. and Margaret M. so that Mary M. was starboard side to the loading platform but to the northward of it, and Margaret M. was starboard side to the loading platform but to the southward of it, the latter being the loading position.

14. After Margaret M. had been fully laden with 771.55 tons of molasses, and some time in the early forenoon of August 19, 1943, Dynamic towed Margaret M. in a southerly direction and moored her with her starboard side to the sand dock. Dynamic then returned to the molasses dock and dropped Mary M. to the southward along the molasses dock in loading position.

15. The loading of Mary M. was commenced at 3:30 p. m. and was completed at about 8:00 p. m. on August 19, 1943, at which time Mary M. had on board 722.57 net tons of molasses. All during the loading operation Dynamic was stationed at Mary M's starboard quarter.

16. When the operation was completed, Dynamic backed out, circled around and came alongside the port side of Mary M. so that Dynamic's bow was in the way of the stern of Mary M. Dynamic then towed Mary M., stern first, down to the sand dock, arriving there at about 8:40 p. m. As Dynamic, with her tow, approached Margaret M's port side, Mary M. was canted in toward Margaret M. at a small angle and the first contact was that of Mary M's starboard quarter against Margaret M's port side, after which Mary M. slid down along the port side of Margaret M. until her stern was even with the former's stern and she was then moored alongside Margaret M. in this position.

17. Thirty minutes after the mooring had been completed, (by Marks, a bargee, and a deckhand on Dynamic) it was observed that Mary M. had a bad list to starboard. Ultimately she careened to starboard. The port side of her cargo tanks hung along the port side of Margaret M., causing the latter to list to port. Mary M. ultimately slid off into deep water and remained bottom up until she was salvaged later. Her cargo was a total loss.

18. In order to prevent Margaret M. from sinking, it was necessary to jettison 121.74 net tons of molasses by the use of bleeder valves. When this was done she righted herself and her pumps were able to function.

19. When moored at the sand dock after the completion of loading, both Mary M. and Margaret M. had a freeboard of about 2 feet 6 inches forward, 2 feet aft, and about 10 inches amidships.

20. At about 9:15 p. m. on August 19, 1943, at most 50 minutes after leaving the

molasses dock, Mary M. had shipped water to a depth of 2½ feet, and at that time water was coming up over the platform at the bow end. At the same time she had a list of slightly more than 2 feet to starboard from the horizontal plane. Within a few minutes thereafter she capsized, as set forth in Finding No. 17.

21. While at the molasses dock, and also at the sand dock, both Mary M. and Margaret M. from time to time surged as the result of swells created by passing ships, but there is no direct evidence of any severe contact suffered by Mary M. between August 17, 1943, and August 19, 1943, either through surging, or shifting, or mooring operations.

22. Beginning on the morning of August 21, 1943, efforts were made to turn the barge Mary M. upright by attaching lines across her deck to the underside of the barge and carrying these lines to tugs which then pulled on them. These efforts were unsuccessful in that although the barge was righted she sank immediately afterwards.

23. Beginning on August 23, 1943, and until October 5, 1943, further efforts to salvage Mary M. were made by an independent contractor, who attempted to pump out the hull of the barge while the tanks were still below the water's surface, but these efforts were also unsuccessful.

24. Finally on October 20, 1943, Mary M. was brought to the surface by the use of two other barges as pontoons.

25. On November 17, 1943, Mary M. was inspected while lying on dry dock and on November 19, 1943, she was further inspected while afloat by surveyors who testified at the trial. Some preliminary repairs had then been made. But no substantial change had occurred in the internal structure and appearance of the barge between August 17, 1943, and November 17, 1943.

26. On and prior to August 18, 1943, the starboard stern rake timber of Mary M. was rotted part way though; it had been fitted with a reinforcing piece which furnished little, if any, support to the rake timber. At the barge's port bow corner

several side planks were rotted on the inside, as were various other structural members, such as hanging knees, the rider log, and anchor stocks. The condition of Mary M's planking made it probable that caulking would not remain in the seams and make them watertight for the same length of time as might be reasonably expected of a barge whose planks afforded better caulking edges.

27. After the careening of Mary M. a large segment of wood at the after end of her stern wearing piece was broken away, and six end planks at the starboard stern corner started off to a distance ranging from one inch at the top, to one quarter inch at the bottom. The damage to the wearing piece, and the starting off of the end planks was due to a violent contact, and there is no evidence that this contact took place or this condition existed prior to the commencement of the careening.

28. Internally Mary M. had, in 1933, been fitted with three longitudinal bulkheads running the entire length of the barge. The wing bulkheads are fitted with scuppers; the center bulkhead is designed to be watertight, and is not fitted with scuppers. The purpose of these members is to minimize the effect of free water in the hold.

29. Molasses cargo has a tendency to creep, i. e., it has not the same tendency to surge and thus keep its surface horizontal as have oil and water cargo, for which reason barges designed to carry molasses, including Mary M., must be protected so far as practicable against low stability and the effect of free water in the hold.

30. Mary M. was equipped with pumps designed to keep her free of bilge water. These pumps were functioning properly, at and prior to the time the barge broke ground at the molasses dock. The bargee of Mary M. was mistaken when he said that he made several trips through the hold on August 19, 1943; he did no pumping during the loading operation on August 19, 1943.

31. When Mary M. left the molasses dock she was, in fact, unseaworthy for the service in which she was engaged, namely, the carriage of molasses, by rea-

son of the condition set forth in Finding No. 26.

32. At the time Mary M. careened on August 19, 1943, Dynamic and the barges Margaret M., Sarazen and Brewer were all moored at the sand dock in the same area where it was proposed to moor Mary M.

33. The return voyage to Brooklyn was not to commence until the complete tow was made up at the sand dock after all four barges had been loaded. Dynamic was assigned by Conners to tow the four barges to Brooklyn.

34. Each barge had its own captain but, while underway, the practice was to assign one bargee as "fleet captain" in charge of all the barges in tow, a practice which was carried out on the Buffalo bound voyage in this case and was planned to be carried out on the New York bound voyage.

35. Under Conners' instructions, the engineers of Dynamic had the duty to supervise and keep in order the machinery of all four barges, and, in fact, one of Dynamic's engineers had worked on and put in condition the pumps of at least one barge before she left the molasses dock.

### Conclusions of Law

1. Mary M. was unseaworthy when she cast off her lines at the molasses dock on the evening of August 19, 1943.

2. This unseaworthiness was the proximate cause, and the only proximate cause of the disaster.

3. The failure of the bargee of Mary M. to pump while she was being loaded on August 19, 1943, was not shown to be a proximate cause of the disaster.

4. The inspection conducted by surveyors of the hull and equipment of Mary M. on August 18, 1943, did not constitute a waiver of the warranty of seaworthiness by libelant, or by libelant's insurance carrier.

5. The burden of proof to establish unseaworthiness of the proximate cause of the disaster was at all times on libelant. This burden it sustained in part by its demonstration of the physical condition of Mary M. on and prior to August

19, 1943, and in part because the rational inference of unseaworthiness arising from the sinking of Mary M. in calm water was neither met nor overcome by proof of any independent intervening or concurring cause, such as an unusually strong physical contact, or negligence in the matter of want of care on the part of Mary M's bargee.

6. Dynamic, Mary M., Margaret M., Sarazen and Brewer were all engaged in a common marine venture, both on the voyage from New York to Buffalo and on the planned voyage from Buffalo to New York.

7. Margaret M. was at all times seaworthy and without fault. A portion of her cargo was necessarily and successfully jettisoned. The only proximate cause for the jettison of Margaret M's cargo was the unseaworthiness of Mary M.

8. Libelant is entitled to an interlocutory decree in personam against Conners as respondent, and in rem against Conners as claimant and owner of Mary M. for the ascertainment of damage without limitation of liability, together with costs. To the extent that it seeks relief in rem against Margaret M., the libel should be dismissed without costs.