## BRONX BARGE CORPORATION v. CONNELLY TRANSP. CORPORATION.

Circuit Court of Appeals, Fourth Circuit.
October 15, 1929.

No. 2852.

Edward E. Elder, of New York City (Huger, Wilbur, Miller & Mouzon, of Charleston, S. C., Foley & Martin, of New York City, Alfred Huger, of Charleston, S. C., and William J. Martin, of New York City, on the brief), for appellant.

Frederick H. Horlbeck, of Charleston, S. C. (Julian Mitchell, of Charleston, S. C., on the brief), for appellee.

Before PARKER, Circuit Judge, and GRONER and SOPER, District Judges.

GRONER, District Judge. A lumber company in Florida, in December, 1925, authorized a New York ship broker to charter a tug and two barges of light draft for use in Florida waters. The charter parties, although introduced in evidence, are not copied in the record, but apparently under one the Bronx Barge Corporation, appellant here, furnished the two barges, and under the other, Connelly Transportation Corporation, appellee here, furnished the tug. It was contemplated at the time the contracts were made that the tug and barges would be ready to leave New York on or about December 24, 1925. The charter party between the lumber company and the barge owner on the one hand, and between the lumber company and the tug owner on the other, provided that the tug Walter Mattich should tow the barges from New York to Florida, so that it is undisputed that all parties knew, generally speaking, the conditions under which the voyage was to be made. The barges were tendered around December 30–31. There was some difficulty, however, in arranging a crew for the tug and in making necessary repairs, and this resulted in a delay of several days so that the trip was not actually begun until the forenoon of January 7, 1926.

The tug Mattich was a 50-ton vessel, 65 feet long, 17 feet wide, drawing 10 feet of water, with an engine of 200 to 260 horse power, and was built for inland towing. The barge Severn was 339.66 gross tons, 154.4 feet long, 23.4 feet wide, and 10.5 feet draft; and the Bronx No. 1 was 308.22 gross tonnage, 155.1 feet long, 23.6 feet wide, and 9.9 feet draft. The barges were each schoon-

er shaped with round bow and stern. Neither of the barges was equipped with an auxiliary engine, and therefore had no power of self-propulsion. Each had a crew of two men.

There were four possible routes from New York south, and there was some discussion early in the negotiations as to which of these should be followed. One was inland via the Raritan canal, Delaware river, the Delaware & Chesapeake canal, and Chesapeake Bay down to Norfolk, and thence through the Virginia and North Carolina canals and sounds to Cape Fear. This route, however, may be eliminated from consideration for it is at least doubtful if boats of this draft could have gone through the Raritan canal at any season of the year, and it is very clear that in midwinter the formation of ice in the canal would make navigation through it practically impossible.

Another is the inshore or tugboat course, which may perhaps be described as hugging the shore line from Sandy Hook to Delaware Breakwater, and thence up Delaware Bay, through the Delaware & Chesapeake canal, and the Chesapeake Bay to Norfolk. This is the ordinary course taken during the winter season by small yachts and tugs and tows of small size and power.

And still another is the same course to Delaware Breakwater, and thence on down the coast well inside the lightships through the Virginia capes and the Virginia-North Carolina canals. This is the course which tugboats and barges between New York and Norfolk ordinarily take.

And the last is the steamship course some 20 miles or more offshore and outside the lightships. The latter is much the shorter in distance, and was the route adopted, the barges being towed tandem on a 500 foot hawser between tug and barge and barge and barge. As the flotilla passed Sandy Hook, the wind was northwest 26 miles an hour; the barometer 30.03; the speed around 5½ miles an hour. On the following day, January 8, the wind had gone to northeast, the sea was rougher, and the progress of the tug and tow was reduced in order to ease the strain on the towlines. In the afternoon, about 5 o'clock, when well outside of and about abreast of Winter Quarter Light, the towline broke, the barges went adrift, and the tug proceeded into Norfolk. One of the barges was rescued by a Coast Guard boat, and the other by a tramp steamer. They had been in collision while adrift and had sustained other damage, and the damages thus sustained constitute the first item in the claim made in this suit against the tug, and, for sake of clarity, we shall determine this question before passing to a discussion of the further claim arising out of the total loss of the barges off Frying Pan Shoals on the second leg of the voyage.

The learned district judge, who heard the case below, exonerated the tug from all responsibility on account of the damages sustained on either leg of the voyage. As to the voyage from New York to Norfolk, he held the tug not at fault, as is claimed by the owners of the barges, in taking the offshore passage, or for failure to turn into Delaware Breakwater under the conditions of weather existing at the time she passed that point. We have given careful consideration to the testimony on these subjects, most of which was by deposition, and find ourselves unable to concur in the conclusion reached by the court below. We do agree with the learned trial judge that the tug was seaworthy, and that under normal conditions she was entirely adequate for the voyage and service which she contracted to perform, but it is also true that she was a very small tug built for inland towing and not intended or expected to tow in the open sea. She was chartered for a voyage which, in view of the season of the year, her small size, and lack of power, imposed upon her the obligation of exercising great foresight and caution, and, in our opinion, it was the failure of her master to observe either of these obligations that caused the disaster which subsequently befell the barges. "In the towing of a boat built only for the shallow water of an inland stream, greater care must necessarily be used when venturing upon an ocean voyage." Jacobsen v. Lewis Expedition Co. (C. C. A.) 112 F. 73–79. Nor may we doubt, after a careful examination of all the evidence, that at least in part the motive which controlled the selection of the outside route was not primarily the safety of the outfit, but the urge to save the charter from cancellation by further delay in the delivery of the tug and barges. Rutland, the broker who negotiated the charter and who was familiar with the negotiations and arrangements of the parties looking to the delivery of the boats in Florida, testified that the charterers were calling for the barges and that it was expedient to take the short course; and Everett, appellee's marine superintendent, who made the trip from New York to Norfolk on the tug, testified that they were in a hurry and wanted to get down and took the outside course because it was the shortest.

At the time the voyage began, the wind was northwest 26 miles. By 2 p. m. it had increased to 39 miles. At Atlantic City the barometer had risen from 30.10 to 30.38; at Cape May from 30.16 to 30.31; and at 9 p. m. the Weather Bureau issued a storm warning from Delaware Breakwater to Savannah. The storm signals were hoisted at the breakwater. The wind, which had grown stronger in the evening and gone to the northward, again changed to northeast as the predicted storm came up the coast. As the tug reached a point some 20 or 25 miles south from the entrance to Delaware Bay the storm had increased to the extent that it was necessary to proceed at slow speed, and shortly thereafter it reached gale force, blowing in a direction which made it impossible for the tug either to turn around or to seek shelter in the quiet waters of Chincoteague. If, instead of the outside, the inshore route had been followed, especially in an offshore wind, there would have been access at nearly every stage of the voyage to good harbors at Atlantic City, Delaware Breakwater, or Chincoteague. At the rate of speed at which the tow was moving, the tug probably passed Atlantic City between 3 and 4 o'clock at night. Precisely the condition of the weather at that time is not shown, but the changing barometer and shifting winds should have warned the master of the tug that he was likely to encounter stormy weather, and as a consequence he should have been on his guard, and at Delaware Breakwater, which he probably passed two or three hours later, he would have seen, had he been on the inshore course, the storm signals, and, with good seamanship, sought immediately the protection of Delaware Bay. Being some 20 or 30 miles at sea, he was unable to see the signals either at the breakwater or at Cape May, and so invited disaster by proceeding on his way and running into a storm which, in his position at sea, he could neither avoid nor render the assistance to his tow which his obligation to it imposed.

We are not unmindful of the fact that the view we have taken of the situation is perhaps shaped to some extent by the events which occurred, but, as the Supreme Court remarked in The Burlington, 137 U. S. 387–392, 11 S. Ct. 138, 140, 34 L. Ed. 731, "there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." Nor are we unmindful of the rule that, where the tug is shown to have a competent and experienced master, much must be left to his judgment and discretion; but in this case the only evidence of the master's competency is the fact that he had a master's license. He was not produced, nor was the mate; and if we indulge the presumption applicable in such cases (The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Luckenback [D. C.] 174 F. 265), we should be justified in concluding either that he failed to possess the knowledge which his position demanded, or that it was the danger of losing the charter, rather than the exercise of his skill, which induced him to take the outside course. In Towing Company v. Egan (C. C. A.) 184 F. 275–278, we said: "Undoubtedly much latitude must be allowed to a ship's master in the control of his vessel, and it may be said that his determination as to the proper manœuvre to make, or the best and safest course to pursue, should be accepted, unless it seems manifest from a full consideration of all the facts and circumstances that he failed to exercise that degree of prudence, care, and caution that one having ordinary maritime skill and experience should and would have shown in the condition in which he was then placed. * * * With a tow that could not be managed in bad weather it was quite, and indeed more, necessary for the tug to guard against and look out for probable storms, and which it would seem, with the admonition of the barometer and other signs of warning familiar to those navigating the sea, ought reasonably to have been foreseen, anticipated, and provided against than it was to pursue any particular course after the same had arisen, and which, by the tardiness of her navigators, placed her in a position in which she was powerless to protect the tow committed to her care."

A full consideration of this phase of the case inclines us to believe that there was a failure on the part of the master of the tug to exercise the degree of care necessary in the circumstances in which he undertook the towage.

The second leg of the voyage resulted in the loss of both barges, and the drowning of the crew of the barge Severn. After complete repairs of the tug and barges at Norfolk, the voyage was begun again on the 18th of January, and the inside or canal route taken to Morehead City, N. C. At Morehead City, storm warnings were up, and the tug lay there between the 22nd and the 26th. On January 26, the voyage was again resumed with the tow in tandem, and Cape Fear was reached on the morning of the 27th. From 7 a. m. to 2 p. m. the wind was southwest,

strong, and a rough sea. During this time the tug remained at anchor. At 2 p. m. the wind went around lightly to the westward, and the master, having decided to pass around Frying Pan Shoals, put out to sea. At the time of the departure there were no storm signals flying at Cape Fear, and, according to Fee, engineer of the tug, it was nice and fair weather, and continued so for three or four hours, after which the wind again shifted to southwest and by 8 o'clock was blowing a gale. The log of the tug shows that, at that hour, the wind was southwest, and the sea too heavy to swing the tug and the two barges around. On the 28th the gale increased in violence, and the tug, being unable to make progress against the storm or safely to maneuver to make harbor, the barges, one after the other, broke up and sank.

The two grounds of liability urged on this phase of the case are, first, that the tug was at fault in not going through Cape Fear Slough instead of attempting to round Frying Pan Lightship in the open sea, and, secondly, in not turning back after leaving Cape Fear when the storm overtook them. The learned district judge who heard the case below, in discussing the movements of the tug and tow after leaving Norfolk, reached the conclusion that, when the tug put to sea, there was every reason to anticipate good weather. He likewise reached the conclusion that it would have been bad seamanship to have attempted to go through Cape Fear Slough, and in both of these respects. we concur. At the time the tug and tow left Cape Fear, there was nothing in the condition of the weather to warn of the approaching storm, and to have attempted to navigate the slough, with or without a pilot, under the circumstances, would have been hazardous and probably without result, for, aside from its tortuous course and shifting bars, it has a least depth of about 9 feet which was not sufficient for either tug or barges. Having attempted passage around Frying Pan Shoals, and being overtaken by a southwest storm, there was nothing the tug could do but hold her course, and this she did to the best of her ability. In the condition of the wind, it was not possible either for the tug to have turned around or to have sought shelter near the shore, and there was no harbor short of Southport, nearly 70 miles away. We are satisfied, from a careful review of the evidence, that in the circumstances in which those in charge of the tug then found themselves, everything was done that could have been done to avert disaster.

Frying Pan Shoals, as is well known, is a dangerous place at all seasons of the year, and it is most dangerous on a southwest wind. When the voyage began at New York, and later when it was resumed at Norfolk, all parties concerned, including the owner of the barges, knew that the only available route from Norfolk south was that which was taken. The suggestion that vessels drawing 10½ feet should navigate a narrow slough of only 9 feet depth is too fantastic to be noticed. In this situation, the master had no choice of routes, and his duty was performed when he exercised his judgment as a mariner in determining the question when to put to sea. He was charged with the obligation of bringing to the performance of his duty reasonable skill and care, and his vessel was liable for his failure in either respect. Tested by conditions as they confronted him on the morning of January 27, we are satisfied that he was justified in attempting the passage in the open sea. We find nothing in the evidence upon which to predicate a finding of inadequacy on the part of the tug. It is not enough that a larger or more powerful tug might have accomplished more. The route from Cape Fear, it seems to us, was the only available one. When it was begun, there was no reason to suppose that a storm would overtake the tug and tow before they reached port. Under these circumstances, it appears to us that the conclusion and decision of the lower court in exoneration of the tug was correct.

This leaves for decision only the question of the right of the owner of the tug to claim the benefit of the limitation of liability prescribed by Act of Congress, Rev. St. § 4283 (Comp. St. 1913, § 8021 [46 USCA § 183]). The right to limit liability is made to depend upon showing that the loss sustained was without the privity or knowledge of the owner. It is quite true there is testimony in this case tending to show knowledge on the part of the owner of the tug in the choice of routes which, as to the first leg of the journey, we have found to be negligence. We do not, however, predicate our finding of fault on that fact alone. The condition of the weather at the time of starting, which the master had notice of and should have been controlled by, the subsequent storm of which the barometer should have given him notice, and which he did not heed, and his failure to make Delaware Breakwater while there was yet time to do so, were more nearly the direct and proximate cause of the disaster than the selection of one route over the other. These acts and omissions, in con-

nection with which the owners were not in privity and of which they had no knowledge, entitle them, we think, to the exemption claimed.

Reversed in part; affirmed in part and remanded.