THE INTERPORTS NO. 767.

THE INTERPORTS NO. 765.

INTERPORTS TRANSP. CORPORATION v. MAINE SEABOARD PAPER CO.

No. 30.

Circuit Court of Appeals, Second Circuit.

Nov. 8, 1937.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Horace L. Cheyney, both of New York City), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Norman M. Barron and Roscoe H. Hupper, both of New York City), for appellee.

Before MANTON and CHASE, Circuit Judges, and COXE, District Judge.

COXE, District Judge.

This is a suit for damages for injuries sustained by the barges No. 767 and No. 765 while under charter to the respondent. Both barges were owned by the libelant. At the trial, the respondent admitted liability for the damage to the No. 765, which left as the only issue in the case the damage to the No. 767. With respect to that damage, the judge held that there could be no recovery because of the protective provisions of the charter party. He accordingly dismissed the libel, and the libelant has appealed.

The two barges were chartered to the respondent under a time charter providing that they were "to be employed for the carriage of pulpwood between ports along the Maine coast, where the barges can get and lay safely aground when necessary, including Haycock's Harbor. * * *" The charter party also provided that: "In all matters relating to the navigation of said barges, masters to be agents of owner, and the owner to relieve the charterer from any loss or damage to said barges caused by errors of navigation."

The No. 767 is a large ocean-going steel barge, without motive power of her own; her crew consisted of three men, including an experienced master; and her draft loaded was about 9½ feet. On September 2, 1935, she was loading pulpwood at the respondent's dock at Haycock's Harbor. The tide at that point had a rise and fall of about 12 or 13 feet, which left the berth completely dry at low water. In consequence, the barge was high and dry on the bottom at every low tide during the two or three days of loading. This, however, was fully contemplated by the charter party, and resulted in no injury to the barge.

About 2 feet from the outer side of the barge amidships as she lay in the loading berth there was a stone ledge protruding from the bottom. This ledge was entirely bare when the tide was down, and its position was well known. At high tide there was about 5 feet of water above the ledge, which was sufficient to float the barge when light; it was not enough, though, to permit the barge to be hauled over the ledge when fully loaded. The barge had made two previous trips to the dock, and on both occasions had been hauled out at high tide without injury. This was accomplished by pulling her straight back about a hundred feet until her bow cleared the ledge, and then swinging her into deeper water.

On the trip in question, a motor launch hired by the respondent came to haul the barge away from the dock about half an hour before high tide. The barge was not then fully loaded, and the master protested against further loading so as to get out at high water. This protest was apparently ignored, and the loading continued for twenty to twenty-five minutes before it was completed. In the meantime, the tide had fallen about 6 inches. The motor launch thereupon made three lines fast on the starboard aft end of the barge, and, instead of hauling her directly astern until she cleared the ledge, as had been done on the two previous occasions, the launch edged her over so that she grounded on the ledge. Later, the tug Rocket, also hired by the respondent, came to the assistance of the launch, and, in attempting to dislodge the barge, only placed her more firmly on the ledge. The barge remained there until the next high tide, when she floated off. The damages claimed are for the resultant injuries.

The damage to the barge was caused primarily by the action of the motor launch in putting her on the ledge; it was further enhanced by the unsuccessful attempt of the tug Rocket to get her off the ledge. The berth itself was not bad, and, if the method of hauling employed on the two previous occasions had been followed, there clearly would have been no damage.

The charter party relieved the respondent from loss or damage "caused by errors of navigation." Without this provision, the respondent was liable only for negligence. It was not liable for any error in navigation on the part of the barge master. The barge itself had no motive power of its own, and could be navigated only by means of towboats. In order, therefore, to give the language of the charter party some effect, the words "errors of navigation" must be held to include

the negligence or negligent navigation of the towing vessels. Berwind White Coal Co. v. United States (C.C.A.) 15 F.(2d) 366.

The libelant insists that this is giving the term "errors of navigation" too broad a meaning, citing The Manitoba (D.C.) 104 F. 145, and The Eli B. Conine (C.C.A.) 233 F. 987. In neither of these cases, however, was it stated that a "fault" in navigation, or negligent navigation, was not an "error" of navigation; it was merely pointed out that "error" and "fault" were not synonymous, and that "error" might exist without fault, and was, therefore, the broader of the two terms.

The decree is affirmed.