### THE VALE ROYAL.

### THE TROJAN.

### THE JOSEPH J. HOCK.

### THE EUGENIA HOOPER.

### THE JOAN KUNKEL.

#### No. 2576.

District Court, D. Maryland.

Aug. 6, 1943.

---

Beeuwkes, Skeen, Oppenheimer & Frank and John H. Skeen, all of Baltimore, Md., for libellants.

Foley & Martin, of New York City, and Lord & Whip, of Baltimore, Md., for respondent.

COLEMAN, District Judge.

The present suit, brought by the libellants as owners of the barge Vale Royal, and as bailees of her cargo of coal, when she stranded in Cape Cod Bay at the eastern end of the Cape Cod Canal, on the breakwater near Sandwich, Massachusetts, during the night of August 24, 1942, is against the Eastern Transportation Company, the tug Trojan and three barges, the Joseph J. Hock, the Eugenia Hooper and the Joan Kunkel, all of which are owned and operated by the Eastern Transportation Company.

The Trojan had been towing all four barges from Jersey City bound for Boston, and had separated the tow for the purpose of going through the Canal. The Joseph J. Hock and the Eugenia Hooper were taken through on the first trip, and the Joan Kunkel and the Vale Royal on the second trip. The stranding of the Vale Royal occurred after the tug had placed all four of the barges outside the breakwater, the first barge, that is, the one at the head of the tow, being the Joseph J. Hock, which the tug directed to anchor, and which did anchor, about three-quarters of a mile northeast of the breakwater. The other three barges took up their positions astern of the Joseph J. Hock, next to which came the Eugenia Hooper, then the Joan Kunkel, and last, the Vale Royal. Thus, the Vale Royal was the barge nearest the breakwater. The wind freshened during the night and reached a velocity of about 35 miles an hour, being a little east of north. A heavy sea was running, the Vale Royal drifted back upon the stone breakwater and was broken up; she and her entire cargo becoming a total loss. She was a wooden, sea-going barge, 200 feet overall, 40 foot beam, 15 foot depth of hold. She was loaded with 1126 tons of bituminous coal.

As a first cause of action, various charges of negligence are made in the libel, separately, against the tug, the three other barges and the owner company. In addition, as a second cause of action, libellants contend that respondent, Eastern transportation Company, has breached the terms of the charter party by which the Vale Royal and her cargo were governed, and that therefore the respondent is liable for the loss, all of which is denied by respondent.

The various charges of negligence made by libellants and relied on at the trial, may be summarized as follows: Loss of the Vale Royal and her cargo was due to negligent failure (1) of the Trojan to hold the Vale Royal off the breakwater; (2) of the Trojan properly to regard the signals of the Vale Royal, and (3) of one or more or all of the barges ahead of the Vale Royal properly to pass on the latter's signals to the Trojan, or to their misunderstanding of these signals.

We will, therefore, consider, separately, what those in charge of the tug Trojan, and of the three barges ahead of the Vale Royal, did by way of navigating and handling each vessel in its relation to the Vale Royal.

First, as to the Trojan, we find the following facts: Her master gave orders to the Joan Kunkel and Vale Royal to remain on short hawser not over fifteen or twenty fathoms, until he could properly reassemble the tow and get under way. The Trojan stood by until these two barges were made fast to each other in this manner and until the Joan Kunkel was made fast to the Eugenia Hooper; then the Trojan's master took her around the stern of the Vale Royal and up to the head of the tow, namely, above the Joseph J. Hock, to which he then made fast by hawser, and presuming everything was in readiness to proceed to Boston, ordered the Trojan ahead. Presently, however, he found the Joseph J. Hock to be in trouble, that is to say, she was having difficulty in raising her anchor. She blew the danger signal, 8 short blasts, and

because of the great strain on the barge's anchor chain, the Trojan was slowed down to one bell, namely, half speed, and her hawser to the Joseph J. Hock was kept taut,—but without success in moving her ahead,—for about an hour, during which the Trojan not only made no head-way, but her master admitted that he was drifting back, all the time, to some extent,—how much he could not figure out at the time. Still being disturbed over the Joseph J. Hock's inability to raise her anchor, he "blinked" the Coast Guard to find out what was the matter. The Coast Guard in due course responded that the Joseph J. Hock's anchor had fouled something on the bottom, and could not be raised, and that the Vale Royal had drifted back and was stranded on the breakwater. The master of the Trojan then finally succeeded in getting under way with the other three barges. The Joan Kunkel had drifted beyond, that is to leeward of, the breakwater but had extricated herself by cutting the hawser that held her to the Vale Royal, and her bow hawser still being fast to the stern of the Eugenia Hooper, all the barges except the Vale Royal were towed further off shore, were there anchored and the Trojan returned to where the Vale Royal was hopelessly stranded.

On these facts the question arises, What should the Trojan have done? Should she originally have anchored her tow farther off shore, or if reasonable prudence did not necessarily dictate such anchorage originally, should the Trojan have taken her tow farther out into the Bay when the head wind freshened? Should she have given some signals to her tow? Should she have otherwise given some aid to the Vale Royal?

■ As to the giving of signals to or otherwise aiding her tow, we find that the Trojan was negligent in this respect. While admittedly she had her hands full with the Joseph J. Hock; while the tow could not proceed until that barge had weighed anchor; while that barge had given her danger signal making it clear that she was unable to weigh anchor; and while the master of the Trojan had summoned the aid of the Coast Guard to ascertain the trouble and the Coast Guard had reported the Joseph J. Hock's dilemma, we are, nevertheless, of the opinion that the master of the Trojan should previously have done something to acquaint his entire tow with the reason for not getting under way. He admitted there had already been a delay of about an hour because of the Joseph J. Hock's inability to weigh anchor, before he summoned the Coast Guard's aid. Then it was too late for him to do anything. The Vale Royal had stranded, or was on the point of doing so. The master of the Trojan, when he saw that his ability to proceed was being indefinitely interfered with unless he put his engine at full speed, which he did not want to do for fear of snapping the Joseph J. Hock's anchor chain, should have acquainted his entire tow with the fact that all was not right, by blowing the danger signal; he should have abandoned his attempt to proceed; he should have required the Joseph J. Hock to put down a second anchor and he should have signaled the other barges to let go their anchors; or he should have ordered his engine full speed ahead, and risked the loss of the Joseph J. Hock's anchor and chain, which presumably would not have occurred, and he could have moved ahead, to safety, with all four barges, because just a little later—but too late,—he was able "to start" the Joseph J. Hock's anchor.

■ As to whether it was negligent for the Trojan to have left the head of the tow only three-quarters of a mile off shore, with a stiff head wind, increasing in strength, we feel that also was a very negligent thing to do. It may not have been negligent to have put the Joseph J. Hock at anchor originally so closely in shore, but as the likelihood of one or more of the barges drifting back became more apparent at night-fall, when the master of the Trojan came out of the Canal with the Joan Kunkel and the Vale Royal and proceeded to make up his tow again, it seems to us self-evident that careful seamanship required him to take the tow further off shore, so that the barges would have more scope in the event of drifting. The tow was a long and heavy one,—four large barges, strung out behind the tug for nearly a third of a mile, with the stiff head wind tailing them in-shore. He admitted that after anchoring the other two barges, he was in a hurry to get back and bring the Joan Kunkel and the Vale Royal through the Canal while the tide still remained favorable; that it was about 8:45 p.m., nearly dark, when he had done so and that meanwhile, the Joseph J. Hock and the Eugenia Hooper had probably been drifting. Further, the master of the Trojan admitted that after making fast to the Joseph J. Hock, he could make no headway because the latter's anchor could not be

got up. In fact, he was not sure but that both the Trojan and the Joseph J. Hock were drifting backwards. However, as already explained, he was afraid to put the Trojan engine at full speed. Because of the prescribed black-out along the shore, due to War conditions, there were no lights on shore on which to take a bearing, except the lights on the breakwater.

Whether all or any part of the aforegoing negligence of the Trojan's master is to be treated as a proximate cause of the loss of the Vale Royal is a matter as to which we will postpone consideration until the situation is reviewed with respect to the handling of the barges themselves.

Accordingly, we now turn to a consideration of the handling of the barge Joseph J. Hock. As already stated, she was the only one of the barges placed at anchor, being at the head of the line. Also, as stated, she had extreme difficulty in breaking out her anchor, and, in fact, it appears from the testimony of her master, which is uncontradicted, that her anchor never was gotten all the way up, even after the Vale Royal had stranded and the Trojan had gotten under way with the other three barges and had anchored them in safety further off shore.

The master of the Joseph J. Hock further testified that he did hear the Eugenia Hooper give one signal to go ahead, that is, the four blast signal but that he didn't pass it on to the tug because he was unable to proceed, due to his anchor trouble, and that, instead, he blew the danger signal. He admits that he may have dragged his anchor to some extent, but was confident it did not drag a great deal. He had some 25 or 30 fathoms of hawser out between his barge and the tug. He testified that he got no response to his danger signal from the tug, but he knew the tug had heard it, having slacked up on the hawser. The Joseph J. Hock had out about 30 or 40 fathoms of anchor chain.

■ From the aforegoing, there seems no reasonable basis to charge the Joseph J. Hock with any shortcoming. She was unable to proceed through no fault of her own equipment or handling. She gave notification that she could not proceed to the vessel that she was primarily obligated to notify, namely, her tug. If there was any obligation to notify the barges astern of her, that obligation had also been fulfilled. While, as hereinafter more fully explained, this barge must have been drifting astern a great deal faster than her master said she did, nevertheless, since she remained fast to the tug, her master had a right to assume that the tug, with her motive power, would at least hold his barge off shore in a position of comparative safety until she got her anchor clear.

■ Accordingly, we pass next to consideration of the handling of the barge Eugenia Hooper which was second in the line, that is, held by hawser to the Joseph J. Hock. The master of the Eugenia Hooper testified that he heard some barge astern give the go-ahead signal, that is, four blasts, which he answered with four blasts, but that he did not know which barge it was; that then he heard a danger signal, also without knowing whence it came, and that he answered with a danger signal. He testified he was positive both these signals came from astern of the Eugenia Hooper, because they were from a manually operated fog horn and he knew the last two barges did not have steam whistles as did he and the Joseph J. Hock, —a fact which was not disputed.

The Eugenia Hooper had out about 20 fathoms of hawser to the Joseph J. Hock and about 15 fathoms to the Joan Kunkel. The master of the Eugenia Hooper testified that the hawser to the Joseph J. Hock was not lengthened, but that he was not certain on this point as respects the hawser that held his barge to the Joan Kunkel.

From the aforegoing, just as in the case of the Joseph J. Hock, we do not believe it is reasonable to charge the Eugenia Hooper with any improper handling or lack of proper equipment. She last received from astern a danger signal, answered it with a danger signal, and had a right to rest upon this until receiving further directions.

■ Next, as respects the Joan Kunkel, her master was not produced at the trial. However, his testimony had previously been taken before a Marine Investigation Board, and was stipulated into the case. It was to the effect that he never anchored his barge after the tug left her with the Vale Royal fast to her stern and proceeded to pick up the rest of the tow; that he heard the Eugenia Hooper blow a four blast signal, which he answered with four blasts; that he heard the Vale Royal blow the same signal; and that no danger signal was heard by him coming from the Vale Royal or any other vessel in the tow. This

testimony, particularly without seeing and hearing the witness, is of very doubtful credibility. The master of the Eugenia Hooper testified that he heard a danger signal which must have come from either the Vale Royal or the Joan Kunkel, and the latter's master claims to have blown none. Herein we incline to the view that he was at fault, whether or not he heard the Vale Royal blow a danger signal, because if the latter was drifting into danger, so must have been the Joan Kunkel also, because the two barges were held together in tandem. However, because of insufficient proof we are not willing to find, as a fact, that the Joan Kunkel was actually at fault, as respects either giving or receiving signals. Furthermore, our refusal to do so does not affect libellants' right to recover, to the extent hereinafter stated, nor their ability so to do, since the Eastern Transportation Company owns both the tug Trojan and the barge Joan Kunkel and the value of the former exceeds the amount of damages claimed in this suit.

■ Lastly, we come to a consideration of the Vale Royal. Her master did not make an impressive witness. His statements were too vague. He testified that he obeyed the direction of the Trojan's master to keep a short hawser between his barge and the Joan Kunkel, the slack of the hawser being on his barge and the eye being on the stern bit of the Joan Kunkel; that he never lengthened the hawser to more than fifty fathoms; that he never anchored the Vale Royal after the tug cast her off, although his deckhand firmly maintained, in deposition testimony, that she was anchored pending the making fast of her hawser to the Joan Kunkel, but this latter testimony we are disposed to discredit; that he signaled the Joan Kunkel with four short blasts to go ahead, which both she and the Eugenia Hooper answered with the same signal; that thereupon, he blew four blasts again in order to ascertain whether the Joseph J. Hock, which had not answered, was also ready to proceed; and that ten or fifteen minutes later he blew the danger signal, because he had noticed, ever since giving the first go-ahead signal, that the Vale Royal was drifting to leeward, which he could tell from the red lights on the breakwater; that this danger signal which he blew only once was not answered by the tug, but by the Eugenia Hooper only; that thereafter he blew the go-ahead signal once again which the Eugenia Hooper alone answered. He further testified that the Vale Royal never went ahead after he blew the signals as just described, but that on the contrary, she kept drifting astern until she struck the breakwater, stern first, about eight or ten minutes after he had blown the danger signal; that after she struck, he let his hawser to the Joan Kunkel run out, which enabled her to drift past the end of the breakwater with the hawser extended over the breakwater; that he then called to the Joan Kunkel's master to cast off the hawser or to cut it, and the latter was done; and that he and his deckhand managed to escape by lowering a small boat from the barge, in which they crossed the very small strip of water that separated the barge and the breakwater, and then were helped off the breakwater by the Coast Guard.

The master of the Vale Royal also testified that his anchor gear was in good condition, that he had two anchors and could have dropped either one in about a minute's time, but that he did not do so because he did not know at what moment the tug might go ahead, and that if she did so, the Vale Royal, with her anchor down, might run over it in which case it would be a difficult job to get it up. He also testified that he was afraid, if he anchored, that the Joan Kunkel would drift back upon the Vale Royal, and that such collision would sink both barges and drown all on board. He stated that although his certificate called for two, he had only one deckhand on board the Vale Royal, a second man whom he had employed having failed to report for the voyage; that he did not know what would have been the proper signal, under the Eastern Transportation Company's Consolidated Code of Signals for Ocean-going and Inland Tugs and Barges, for him to have given had he decided to anchor the Vale Royal; and that he was close enough to the Joan Kunkel to communicate with those on board of her by calling. He said he did not hear the Joseph J. Hock give any signal whatsoever, and, also, that he could not see what the tug was doing, or what was the position of any of the other barges in the tow except the Joan Kunkel.

It was stipulated that the Vale Royal was in every respect seaworthy at the time she left Jersey City. One of the libellant-owners of the Vale Royal testified that in the course of efforts to ascertain whether the Vale Royal might be salvaged, there

were found aboard her about one hundred fathoms of hawser.

On the aforegoing facts, we are satisfied that the master of the Vale Royal was guilty of very great negligence in that, in view of the precarious situation in which he found the Vale Royal upon receiving no response from the tug to his danger signal, and knowing that the Vale Royal was still drifting astern, he failed to repeat the danger signal or to give the "call for tug" signal contained in the Consolidated Code of Signals, namely, one long, three short and, one long blast, either one or both of which signals he should have given repeatedly, in an effort to attract attention of the tug directly, or through one or more of the barges ahead of him so that they might have relayed such signals to the tug. We are not willing to assume that had he done so, such repeated signals would not have been relayed by the other barges up to and heard by the tug Trojan, even though, because of the distance that separated her from the Vale Royal and the strong head wind, it probably was not possible for those aboard the tug to have heard, directly, a blast from the Vale Royal's manually operated fog horn, or from any other type of signalling device in common use on such barges.

What the Trojan might have been able to do, in the emergency, that would have prevented the Vale Royal stranding is, of course, a matter of speculation. Presumably, upon hearing such repetition of signals from the Vale Royal, the Trojan would or should have signaled her to anchor. Whether this could have been accomplished successfully is not the question. It was the duty of the Vale Royal to make a greater effort than she did make to acquaint her tug with her critical position, and to ask for instructions and help. It is not for the master of the Vale Royal to say that his predicament could not have been remedied, when he failed to take the precautions that the ordinary prudent barge-master would take under such circumstances.

If, after having given the repeated signals just referred to, no response had come, then it would have been incumbent upon the master of the Vale Royal to make for himself a quick decision as to what it was best to do in order to save his vessel. Presumably, under such circumstances, he should have dropped one anchor, or even both, which would have afforded him the one remaining chance of keeping off the breakwater. This might not have proved successful, because his anchor might not have held, or holding, the Joan Kunkel might have drifted down upon him. However, he would have been obligated to resort to this, the only means of possible safety for his barge that was left to him. A fortiori, it necessarily follows that, having neglected to give the repeated signals which reasonable prudence required him to do when he found he was steadily drifting towards the breakwater, he was clearly obligated to drop anchor. There was some testimony adduced on behalf of respondents tending to indicate that a proximate cause of the stranding was that the Vale Royal's hawser got out of hand. She was undermanned, as already pointed out, so this further piece of negligence may, in fact, have occurred, but as to this we make no specific finding, for lack of sufficient proof.

In further aggravation of the case against the master of the Vale Royal, it is to be noted that by his own testimony, he said he was not familiar with the various company code signals which his employer and owner of his vessel, namely, the Eastern Transportation Company, required him to adopt and which he admitted were posted in the wheel house of his barge. These signals are not required by law, but they are reasonable requirements for safe operation of tows of this character.

We thus find both the tug Trojan and the barge Vale Royal at fault. We now turn to a consideration of whether the fault of each was, in fact, a proximate cause of the loss of the Vale Royal and her cargo.

A tug is not an insurer of its tow or of the latter's cargo, nor does it, in the absence of express agreement, stand in the position of a common carrier. But a tug is required to exercise reasonable prudence and maritime skill with respect to both tow and cargo, and for omission in this respect, liability follows. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 21, 76 L.Ed. 517; The Margaret, 94 U.S. 494, 24 L.Ed. 146; Maryland Transportation Co. v. Dempsey, 4 Cir., 279 F. 94; Bronx Barge Corp. v. Connelly Transportation Co., 4 Cir., 35 F.2d 294; Southgate v. Eastern Transportation Co., 4 Cir., 21 F.2d 47. However, the fault of a tug may be so antecedent to the fault of its tow as not to be a proximate or concurrent cause of

the ensuing damage. Whether such was the case here is the question for decision.

We reach the conclusion that the fault of the Trojan and of the Vale Royal were both proximate and that, therefore, the liability is joint. We do not consider that this is a case for the application of the last clear chance rule or for the doctrine of major and minor fault. We might have some hesitation in so concluding had the Trojan's negligence been confined to the question of where her tow was placed during the process of reassembling it after bringing it through the Canal. Whether the Trojan's negligence in this respect was so antecedent to the Vale Royal's negligence in not giving adequate danger signals or anchoring, or both, as not to be considered proximate, we really need not decide because the Trojan's other act of negligence in not keeping her entire tow, including the Vale Royal, properly advised of the Trojan's indefinite postponement of getting under way, by sounding the danger signal repeatedly if unanswered, was so clearly a proximate cause of the stranding of the Vale Royal as to remove any question of doubt, since, as just stated, the Vale Royal was entitled to know what was going on at the head of the line of vessels. She endeavored to find out. It is true, she did not use sufficient prudence and diligence in so doing, but, on the other hand, it is entirely reasonable to say that the shortcomings of her master in this respect were largely induced by the failure of the master of the Trojan to do his full duty by means of signalling.

Similarly, as we have found, it was the duty of the master of the Trojan to try to "break out" the Joseph J. Hock's anchor by going full steam ahead, or to blow her and the rest of the tow to anchor, because he virtually admitted by his own testimony that the Joseph J. Hock was dragging her anchor and had been doing so even before he began, at dusk, to reassemble his tow. This must be true because the Joseph J. Hock was the only one of the four barges that had anchored. Up to the time of the Vale Royal's striking the breakwater, all barges were tied in tandem to the Joseph J. Hock. Therefore, the latter must have been drifting or none of the others would have drifted, unless (1) a hawser had parted or been cast off, or (2) a hawser had been let run to an undue extent. There is absolutely no evidence that the first of these contingencies happened, and as to the second, the weight of the credible evidence is clearly to the contrary. Even if we give credence to such evidence as there is that those aboard the Vale Royal had lost control of their hawser or had negligently allowed too much of it to be paid out, still, obviously, this cannot possibly account for the Joan Kunkel having drifted into the precarious position that she did. Such drifting must have been due primarily, if not solely, to the fact that the entire line of barges was drifting. While it is not clear from the testimony just what was the position of the tug and the first two barges in relation to the end of the breakwater when the tug finally got under way with all of the barges, except the Vale Royal, and towed them off shore to a position of safety, there is no claim that the hawsers between these three barges were ever parted or cast off, and the same is true as respects the hawser from the tug to the lead barge, the Joseph J. Hock. Therefore, the tug and the first three barges must have drifted well in towards the breakwater. In short, neither the tug nor the Joseph J. Hock's anchor was holding the tow in position in the face of the strong head wind and heavy sea. When the Coast Guard informed the tug's master that the Vale Royal had stranded, he was able to extricate the other three barges from a like fate. We can not reasonably say that the loss of the Vale Royal was an accident,— that is was due to weather conditions,— because prudence in handling his tow from the time he brought the first two barges through the Canal, would have overcome these conditions.

We have examined all of the decisions to which counsel for both libellants and respondent have referred, and we believe none of them give any support for a conclusion contrary to that which we have reached.

Our conclusion being that both the tug Trojan and the barge Vale Royal were guilty of faulty navigation directly responsible for the stranding and loss of the latter vessel and her cargo, and that, therefore, barring some meritorious defense by reason of the charter party or the bill of lading, the resulting loss must be borne equally by these two vessels, we now turn to a consideration of the question as to whether respondent's answer to libellants' second cause of action does raise a meritorious defense.

This second cause of action as stated at the commencement of this opinion is based upon the contention that respondent, Eastern Transportation Company, breached the terms of the charter party by which the ill-fated voyage of the Vale Royal was governed and that, therefore, that company is liable for the entire loss. By way of defense, the Eastern Transportation Company denies any liability on the ground (1) that the charter party exempts it from liability for negligent navigation, and (2) that in so far as cargo loss is concerned, the provisions of the bill of lading similarly relieve it of liability to libellants. We will take these two questions up in the order in which they have been stated.

First, as respects liability for loss of the Vale Royal, the charter party is a formal written document of considerable length, executed on May 8, 1942, extending until April 1, 1943, unless terminated sooner by reason of the conclusion of the War, and covering also five other barges of libellants of relative tonnage to the Vale Royal. The following provisions in the charter party are directly pertinent to the question of liability here involved:

"1. Barges shall be surveyed before delivery and again at redelivery to determine conditions of barges under the terms of the charter. Any damage sustained by barges while being used under this contract, less ordinary wear and tear, insofar as said damage is not caused by failure on the part of the owners to use due diligence to make said barges seaworthy at the time of delivery of said barges, and insofar as said damage is not due to latent defects, shall be paid for by the Charterers, and the Charterers to return the vessel to the Owners in the same seaworthy condition in which it was delivered, less ordinary wear and tear."

"6. That the Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers."

"9. That should any barge be lost, any hire paid in advance and not earned (reckoning from the date of loss) shall be returned to the Charterers. The Act of God, enemies, fire, restraint of princes, rulers and people and all dangers and accidents of the seas, rivers, machinery, boilers, steam navigation and errors of navigation, throughout this Charter Party always mutually excepted."

"11. Nothing herein stated is to be construed as a demise of the vessels to the Charterers. The Owners to remain responsible for the navigation of the vessels, insurance, crew and all other matters, same as when trading for their own account."

■ While prima facie paragraphs 6 and 11 above quoted may seem to be contradictory of each other, this is not necessarily true. These or similiar provisions are rather commonly used together in charter parties of this nature. We interpret paragraph 11 to mean that the general control of the barges remained with libellants, their owners, but that by paragraph 6 the direction of any particular towing voyage was to be determined and controlled by the charterer, the respondent. In other words, the contemplated situation was akin to that disclosed in the case of New Orleans Belize S. S. Co. v. United States, 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227, where the charterer of a vessel does not become owner pro hac vice, when control of the vessel remains with the general owner, even though the direction in which the vessel proceeds is determined by the charterer.

Turning, however, to the other two paragraphs of the charter party which we have quoted above, namely 1 and 9, there is a far greater inconsistency. Therefore, the question is directly presented: Which one controls?

■ We believe that paragraph 1 is basic and controls. It makes the charterer liable for all damage except (1) ordinary wear and tear; (2) damage due to owner's failure to exercise due diligence to make the barge seaworthy at the time of delivery to the charterer; and (3) damage due to latent defects. Respondent, however, claims that paragraph 9 nullifies any such effect that might otherwise be given to paragraph 1. We do not agree. Subject only to the above exceptions, it seems clear that paragraph 1, standing by itself, would impose an absolute obligation to return the barges covered by the charter party at the expiration of the term, in the same seaworthy condition in which they were delivered. See Sun Printing & Publishing Co. v. Moore, 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366. Libellants claim that the purpose and intent of paragraph 9 relates only to adjustment of charter hire and that, therefore, the prima facie inconsistency between paragraphs 1 and 9 can be satisfactorily explained in this way. The last sentence

of paragraph 9, which is the one that causes the difficulty, namely, the clause containing contingencies declared to be "throughout this charter party always mutually excepted," is, it is to be noted, a clause of a general character. The only exceptions in it which have any bearing upon the present controversy are "errors of navigation," and yet, since nothing is contained in the charter party concerning navigation of any vessel other than the barges, it is neither reasonable nor necessary in the present case to say that such exceptions cover "errors of navigation" of some other boat, namely, the tug in the present instance. We are aware that in this respect our conclusion is contra to that reached in The Interports No. 767, 2 Cir., 92 F.2d 601, but for reasons to which we will presently allude, we consider the agreement in that case different from the one here.

 In view of what has just been said, it becomes unnecessary to decide, as libellants contend, that the purpose and intent of paragraph 9 relate to adjustment of charter hire only. Suffice it to say that such a provision as paragraph 9 in a charter party such as the one in suit, which contains independent covenants to be performed by each party, may well be interpreted merely as relieving each party from liability to the other on account of the breach of any such covenants on his part, where it results from any one of the excepted clauses. For example, after providing in paragraphs 2 and 3 for all towage charges, etc., by the charterer and what barges are covered by the charter party, paragraph 4 sets out the rate of hire; paragraph 5 provides when payments are to be made; paragraphs 6 and 7, the status of barge captains and under what conditions they may be changed; paragraph 8, for suspension of running of hire under certain specified conditions; paragraphs 10 and 12, for payment of wages, insurance, etc.; paragraph 14 (there is no paragraph 13) makes the parties subject to all pertinent Federal and State laws, orders, etc.; paragraph 15 provides that indemnity against loss shall be given by libellants to respondent; and lastly, paragraph 16 provides for general average. It is certainly reasonable to say that if a breach of any of these covenants should result from any of the causes excepted in paragraph 9, then the party committing such breach would be exempt from liability therefor, but not otherwise. There is support for this view in two very well-considered cases where the charter parties contained "always mutually excepted" clauses almost identical with the one before us. See Clyde Commercial S. S. Co. v. West Indian S. S. Co., 2 Cir., 169 F. 275; Pool Shipping Co. v. Samuel, 3 Cir., 200 F. 36.

 Respondent relies on The Interports No. 767, supra, but we agree with libellants that that decision is not controlling in the present suit. While there, just as in the present case, the charter was not a demise and while also, the agreement contained a clause similar to paragraph 9 of the charter party now before us, the significant and distinguishing thing is that there was no clause similar to paragraph 1 of the charter party in suit. We are not disposed to discard a clearly worded, entirely understandable clause, as is paragraph 1, placed at the beginning of the contract, for four lines of ambiguous, antiquated phraseology plucked, presumably, out of an unrelated document and inserted as the latter part of a subsequent paragraph (paragraph 9) which commences by referring to a specific matter, namely, adjustment of the vessels' hire in the event of loss with which the ambiguous part can consistently be read. If parties to contracts, either deliberately or through inadvertence, employ ambiguous language, it is the duty of the court, when called upon to interpret that language, to give, if possible, such effect to it as will not destroy the effect of other clauses clearly phrased and free from any doubt as to their meaning. Admiralty litigation continues to be far too replete with obscurely drawn agreements, such as the one in suit. It is, therefore, appropriate for the admiralty courts to reiterate not merely the hope but the earnest plea that those entering into charter parties or related agreements shall take more care to avoid the charge that, by their written documents, they all too frequently neither mean what they say nor say what they mean.

We have been referred to no case which we believe is contrary to the conclusion here reached. Berwind White v. United States, 2 Cir., 15 F.2d 366, for example, is not, we believe, contrary, because the provisions of the charter party were not the same as here. Although it is true that there the court reiterated the doctrine

prevailing in the Second Circuit that a covenant to redeliver in good condition, less wear and tear, adds nothing to the charterer's obligation, we are satisfied that paragraph 1 in the charter party before us must be construed more literally in favor of libellants. Nor are we impressed with respondent's argument that because the present charter party was executed during war time and when great hazards of coast-wise navigation were present, it is not to be implied that respondent, for the rate of hire stipulated in the charter party, was willing to assume an obligation which might be customary in normal times to pay the value of the vessel in the event of. her loss, due to an error in navigation by one of respondent's employees.

■■■ Therefore, since we have found that the tug Trojan was guilty of faulty navigation directly responsible for the loss of the Vale Royal, independently of the faulty navigation of the Vale Royal; and since, for the reasons just stated, para-- graph 1 of the charter party renders the respondent, the Trojan's owner, liable for damage caused by such faulty navigation, we, therefore, conclude that liability for the loss of the Vale Royal must be divided between her and the Trojan.

■■■ We now turn finally to the question of liability for loss of the cargo. At the time of the Vale Royal's stranding, she had aboard approximately 1126 tons of coal. This cargo was covered by a bill of lading given by the master of the Vale Royal to C. H. Sprague & Son Company, of Jersey City, as shipper, with the Metropolitan Coal Company, Chelsea, Massachusetts, named as consignee. More specifically, as disclosed by the amended libel, this last-named company owned the coal and it is on its behalf, as bailees of the cargo, that libellants have brought their libel. A question has been raised as to the right of the libellants to sue in this capacity. However, as to this point, we do not feel that there can be any serious question. It is a settled rule in admiralty as well as at common law, that either a bailor or bailee may sue a tort-feasor for destruction of the bailed goods. Payment to the bailee will bar any subsequent suit by the bailor. See The Beaconsfield, 158 U.S. 303, 15 S.Ct. 860, 39 L.Ed. 993; The W. C. Block, 2 Cir., 71 F.2d 682, certiorari denied 293 U.S. 579, 55 S.Ct. 91, 79 L.Ed. 676.

Libellants contend that since respondent, Eastern Transportation Company, is not a party to the bill of lading, that document being a contract between the shipper of the cargo and the barge Vale Royal only, the provisions of the bill of lading do not determine the question of respondent's liability for the cargo. On the other hand, Eastern Transportation Company contends that libellants are not really bailees of the cargo since they made no agreement with the cargo owner to carry the coal or to be liable therefor, and received no freight money, and that as there was no privity of contract between libellants and the cargo owner, the latter would have no claim against libellants in personam and that, therefore, the Eastern Transportation Company, and that company alone, was the contracting carrier of the cargo, and the pro hac vice owner of the Vale Royal for all purposes in so far as the cargo is concerned. But the Eastern Transportation Company further claims that, in any event, the exceptions from liability contained in the bill of lading apply to relieve that company from any liability on the facts in the present case.

■■■ We think it is clear that the relations between libellants as bailees of the cargo, and the Eastern Transportation Company, respondent, are governed by the bill of lading and that in so far as the cargo is concerned, the charter party is to be ignored.

The bill of lading is on a printed form, containing, it is true, reference to a charter party but with blank space for indication of charter party of a particular date, and no reference has been inserted. Instead, merely the typewritten word "agreed" is inserted after the printed words "charter party". Just what is the significance of this word is not clear. It may be assumed that it was intended to refer to (1) a charter party already in existence; or (2) one to be executed; or (3) was merely a repetition of the printed reference to payment of freight as agreed. However, we do not consider that it is necessary to resolve this doubt because we are satisfied that the bill of lading, even though it is dated subsequent to the date of the charter party in the present suit, cannot be interpreted as referring to that document, because where a bill of lading refers to, or incorporates a charter party, the latter document is always between the cargo owner or shipowner on the one hand, and the carrier on

the other. In the present case, neither the tug nor her owner, the Eastern Transportation Company, are parties to, or named in, the bill of lading. On the other hand, the bill of lading is a contract between the cargo owner on the one part and the master of the barge on the other, who must be considered as acting as agent for the owner of the tug, the Eastern Transportation Company. That is to say, the owner of the tug was transporting the cargo for which, under its time charter, it was entitled to receive the freight. It was not merely towing the barge. Of the latter, therefore, it was owner pro hac vice.

In addition to the language in the bill of lading already referred to, it contains the following provisions: (1) provision defining the extent of liability in the event of collision with another vessel, with which we are not here concerned; (2) enumerated exceptions, including acts of God, perils of the sea and "stranding and accidents of navigation, * * * even when occasioned by the negligence, default or error in judgment of the pilot, master, mariners, or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case from want of due diligence by the owner of the ship"; and (3) provision that "this shipment is subject to all the terms and provisions of and all the exceptions from liability contained in the Act of Congress of the United States relating to navigation etc., approved on the thirteenth day of February, 1893, and bills of lading are to be issued in conformity with said Act,"–namely, the Harter Act, 46 U.S.C.A. §§ 190–195. There is an additional provision relative to the carrier's compliance with requirements of the United States Maritime Commission or the vessel's War Risk Underwriters, with which we are not here concerned.

At this point we are again forced to deprecate the fact, just as we did in construing the equally confusing charter party in the present suit, that any responsible shipping concern would befuddle such a substantial transaction as the present one, by permitting the use of such unintelligible documents.

It is to be noted that the exception clause in the bill of lading purports to give to the carrier an excuse for loss under numerous circumstances, including "stranding and accidents of navigation," even when occasioned by the negligence of the shipowner's employees "not resulting, however, in any case, from want of due

diligence by the owner of the ship." While the language employed in stating the various exceptions is quite similar to some that is contained in the 1936 Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315, we do not interpret this as actually resulting in the incorporation of that Act in the bill of lading. That Act expressly relates to foreign trade; that is, to the transportation of goods between ports of the United States and foreign ports. It is true provision is made for adoption of the Act in cases of domestic trade but this must be by express agreement (Section 13, 46 U.S.C. A. § 1312), in which event it supersedes the earlier, that is, the Harter Act (Sec. 12, 46 U.S.C.A. § 1311). There is no such express agreement in the bill of lading in suit, but even if the Carriage of Goods by Sea Act were expressly incorporated in the bill of lading, the result of our decision would be the same for the reasons presently explained, because, while by the Harter Act such immunities as are granted are expressly made to depend upon the exercise of due diligence to make the vessel in all respects seaworthy, so that if there is a lack of such diligence the vessel owner is liable notwithstanding the fact that there may be no causal connection between the damage and the lack of diligence, by the 1936 Act, the vessel owner while required to exercise due diligence in furnishing a seaworthy vessel incurs no liability for loss arising even from unseaworthiness unless such is caused by lack of due diligence to make the vessel seaworthy. In short, the later Act does not condition its exemptions upon due diligence to make the vessel seaworthy but only liability for loss due to unseaworthiness is so conditioned.

It is well settled that when the Harter Act is incorporated, as in the present case, in the bill of lading, its provisions prevail over the other provisions. The Agwimoon, 4 Cir., 31 F.2d 1006, certiorari denied 279 U.S. 874, 49 S.Ct. 514, 73 L.Ed. 1009; The Nordhvalen, D. C., 6 F.2d 883; see also Commercial Credit Corp. v. New York Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. "Stranding" alone was not the cause of the loss of the Vale Royal and her cargo, but, as we have seen, was the result of negligence in the navigation or management of that vessel and also of her tug. Therefore, in order to obtain the benefit of such an exception clause in the bill of lading, the effect of the Harter Act must first be applied. By Section 3 of that Act, the ship-

owner must affirmatively prove that he exercised due diligence in making the transporting vessel seaworthy when the voyage began. May v. Hamburg, etc., Gesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348. In the present case, it is agreed that both the Trojan and the Vale Royal were in every respect seaworthy at such time.

Therefore, the only question remaining to be determined is whether the two vessels, the tug and the barge, constitute the "vessel transporting merchandise or property" within Section 3 of the Harter Act, 46 U.S.C.A. § 192, that is to say, whether they are to be treated as one vessel. In Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, the tug and the barge were so treated in a case where they both had the same owner. Smilarly, in In re O'Donnell, 2 Cir., 26 F.2d 334, the same result was reached where the tug and barges were owned by different persons but under an arrangement for sharing profits. Libellants contend that unless the Sacramento Navigation Company case is extended beyond what they contend are the permitted limits of that decision, the Harter Act should not be held to apply to the present case and that, therefore, recovery should be allowed against the tug Trojan for the loss of the cargo. With this contention of libellants we do not agree. We do not understand that the Supreme Court in its decision in the Sacramento Navigation Company case intended to draw any sharp lines as respects ownership of the two vessels. It is true, as libellants contend, in that case certain language is employed with respect to The Murrell, 1 Cir., 195 F. 483, and The Coastwise, 1 Cir., 233 F. 1, which might, prima facie, tend to indicate the limitation in the Sacramento Navigation Company case for which libellants contend. With respect to these cases, the Supreme Court said, 273 U.S. at page 331, 47 S.Ct. at page 370, 71 L.Ed. 663: "Some things are said in those cases which, if we should not consider the differences between them and the present case, might justify this contention. The most important of these differences is that in both cases it was held that contracts of towage and not of affreightment were involved. We do not stop to inquire whether this conclusion as to the nature of the contracts was justified by the facts. It is enough that it was so held, and this holding was the basis of the decisions. Here, upon all the facts, as we have just said, the contract

upon which respondent must rest is one of affreightment, the obligation of which is to carry a cargo, not to tow a vessel."

From this language, it is clear, first, that the Supreme Court intended to rest its distinction between the Sacramento Navigation Company case and these earlier decisions upon a definite difference understood to exist between the character of the contracts of carriage, namely, that the contract was one of affreightment in the Sacramento Navigation Company case, and one of towage in the other cases. An examination of these earlier cases indicates that such was true. Charter party agreements, not bills of lading, were the subject of interpretation. Such, it is to be noted, is not true with respect to the cargo in the present case. We have only the bill of lading, a contract of affreightment. We are satisfied that the following very clear and succinct language of the court in the Sacramento Navigation Company case must be treated as controlling in the present instance unless we are prepared, as we are not, to rest our decision upon what we believe to be an unreasonably narrow distinction (273 U.S. at pages 328, 329, 47 S.Ct. at page 369, 71 L.Ed. 663):

"The fact that we are dealing with vessels, which by a fiction of the law are invested with personality, does not require us to disregard the actualities of the situation, namely, that the owner of the tug towed his own barge as a necessary incident of the contract of affreightment, and that the transportation of the cargo was in fact effected by their joint operation. The bill of lading declares that the cargo was shipped on board the barge. But it was to be transported, and this the barge alone was incapable of doing, since she had no power of self-movement. It results, necessarily, that it was within the contemplation of the contract that the transportation would be accomplished by combining the barge with a vessel having such power. Respondent says there was an implied contract to this effect; that is, as we understand, a distinct contract implied in fact. But a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made. 3 Williston on Contracts, § 1293; Brodie v. Cardiff Corporation, (1919) A.C. 337, 358; and there is no

426

justification here for going beyond the contract actually made to invoke the conception of an independent implied contract.

"Considering the language of the bill of lading in the light of all the circumstances, it is manifest that we are dealing with a single contract, and the use of the tug must be read into that contract as an indispensable factor in the performance of its obligations. To transport means to convey or carry from one place to another; and a transportation contract for the barge without the tug would have been as futile as a contract for the use of a freight car without a locomotive. In this view, by the terms of the contract of affreightment, in part expressed and in part necessarily resulting from that which was expressed, the transportation of the goods was called for, not by the barge, an inert thing, but by the barge and tug, constituting together the effective instrumentality to that end."

As already stated, the seaworthiness of the tug has not been disputed, and while incompetency of the master or crew of a barge due to lack of adequate training or experience, would, if proved, be an element of unseaworthiness (Continental Insurance Co. v. Temple S. C. Co. Ltd., 4 Cir., 137 F.2d 293, decided July 29, 1943, and cases cited), there is no claim that such was the case here, nor is there anything in the evidence to indicate it. The master of the Trojan simply failed on this occasion to exercise proper judgment.

To summarize our conclusions: (1) The tug Trojan and her owner, the Eastern Transportation Company, are liable to libellants for one-half of the loss of the Vale Royal; but (2) they are not liable to libellants for the loss of the Vale Royal's cargo. A decree will be signed accordingly.